**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Anthony HERNANDEZ, Defendant-Appellant.**

**No. 79–5684.**

United States Court of Appeals, Fifth Circuit. Unit B

June 1, 1981.

Don S. Cohn, Robert C. Hill, Miami, Fla., for defendant-appellant.

Lynn Hamilton Cole, Judy S. Rice, Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before MORGAN, ANDERSON and THOMAS A. CLARK, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant Anthony Hernandez was convicted of three counts: conspiracy to possess methaqualone (a Schedule II controlled substance) with intent to distribute in violation of 21 U.S.C.A. §§ 841(a)(1) and 846 (1972), possession with intent to distribute methaqualone in violation of 21 U.S.C.A. § 841(a)(1) (1972), and distribution of methaqualone in violation of 21 U.S.C.A. § 841(a)(1) (1972). Appellant asserts four errors: (1) the district court erred in admitting evidence which had been illegally seized and ordered suppressed. The court admitted the evidence for the limited purpose of impeaching or rebutting appellant's trial testimony; (2) the district court erred in not declaring a mistrial when the prosecutor's questions allegedly forced appellant's counsel to advise appellant, in the presence of the jury, to assert the privilege against self-incrimination; (3) the court erred in admitting co-conspiratorial hearsay without satisfying the *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), standard; and (4) insufficiency of the evidence to support the conviction. We affirm the judgment of the district court.

## I. FACTS

The facts, viewed in the light most favorable to the government, show that appellant's co-defendant Adrian Koutrumbas[1] contacted Lowell Miller, an undercover agent for the Drug Enforcement Administration, to discuss the sale of a quantity of quaalude (methaqualone, a Schedule II controlled substance) tablets. Several discussions and meetings ensued. Finally, on March 29, 1979, Koutrumbas arranged to meet with agent Miller at the Greek Village Restaurant in Tarpon Springs, Florida. During the meeting, Koutrumbas gave Miller three sample tablets of methaqualone and Miller agreed to purchase 50,000 pills. On April 4, Koutrumbas told Miller that his friend from Miami had brought the tablets

---

1. Koutrumbas was tried separately.

into town and they were ready to close the deal. The purchase was arranged ,for the following day, April 5, at 4:00 p. m. at the Greek Village Restaurant.

The exchange actually took place at the Deep Disco Lounge located a short distance from the Greek Village Restaurant. The agents met Hernandez in the rear of the Deep Disco. During the meeting, appellant retrieved three decoratively-wrapped packages from his pick-up truck and put them in the agent's car. As he did so he said as to the first package, "this is for your mother," and then, "this is for your father." The agents also testified that he pointed to the packages and said, "twenty-four, twenty-four, and one," indicating the total number of 49 or 49,000 tablets, the agreed upon quantity purchased. The packages were later found to contain 49,000 quaaludes. Thereupon the agents placed appellant and Koutrumbas under arrest. Following the arrest, Agent Miller asked appellant whether he knew what was in the packages, to which he replied, "yeah."

Following the arrest, the agents seized a briefcase from appellant's truck. The briefcase contained a variety of pills, some of which were quaaludes like the ones in the packages. The district court, however, ordered the briefcase and its contents suppressed as the products of an illegal search and seizure.

During the trial appellant took the stand in his own defense. He testified that he lived in Hialeah, Florida, and was employed as a sales representative for a seafood supplier. He testified that he left Hialeah at about 5:00 a. m. on April 5 and drove to Tarpon Springs to meet Koutrumbas to discuss the possibility of supplying Koutrumbas and his associates with seafood on a regular basis. He testified that he spent the afternoon with Koutrumbas, that Koutrumbas had asked him to load into his truck three "gifts" to be delivered to some friends later that day, and that Koutrumbas said that the packages contained Greek statues which were too heavy for him to lift due to his bad back. The gifts turned out to be the three packages of quaaludes. Later in the afternoon, appellant and Koutrumbas returned to the Greek Village Restaurant, but Koutrumbas directed appellant to park his truck in the rear of the Deep Disco Lounge. When the agents arrived, Koutrumbas asked appellant to give the "gifts" to his "friends." Appellant admitted to "ad libbing" as he transferred the packages from his truck to the agent's car, saying this is for your mother and father, but denied mentioning a series of numbers during the exchange. As to his knowledge of the true contents of the packages, he testified on direct examination as follows:

Q. And did Mr. Miller ask you a question whether you had knowledge of what was in those boxes?

A. He had asked me, "You know what's in those boxes?" And I had—I believe, sir, that I said, "I think so."

Q. Had the boxes ever been opened and shown to you?

A. No, sir. The gifts were never—when I delivered the gifts to Mr. Miller, they were never opened in front of my eyes.

Q. Now, thinking back, what was your thought as to the contents of those boxes when Agent Miller asked you what was in them?

A. Greek statues.

Q. Did you ever have the knowledge or the intent at any time while you were in Tarpon Springs to distribute any controlled substances?

A. No, sir.

(Record, vol. III at 24–25).

On cross-examination, the Assistant United States Attorney pressed appellant on his familiarity with quaaludes or methaqualone:

Q. Have you ever seen methaqualone before?

. . . . .

A. I've seen—yes, I've seen pills—yes—but no distinction. I couldn't—

Q. Do you know what is commonly termed or called a "quaalude"?

A. I've heard of the word.

Q. Did you hear your counsel ask witnesses today and yesterday about tablets with markings "Rorer 714" on them?

A. Yes, ma'am.

Q. And he asked that in asking them to describe a methaqualone tablet with "Rorer 714" on it, do you recall that?

A. Vaguely, yes, ma'am.

Q. Have you ever seen a white tablet with "Rorer 714" marked on it?

A. Yes, I might have seen a white tablet. The markings I could not tell you about.

Q. Did you see any white tablets on April 5th, 1979?

A. No, ma'am.

Q. No white tablets at all?

A. No, ma'am.

Q. Is it your testimony that you saw no methaqualone or quaalude tablets on that day in question?

A. On April the 5th, ma'am?

Q. Yes.

A. No, ma'am.

Q. Mr. Hernandez, if you saw them, would you recognize them?

A. No, ma'am.

MRS. COLE: May it please the Court—

BY MRS. COLE:

Q. Mr. Hernandez, have you ever had any methaqualone or quaaludes in your possession?

MR. ENGEL: I'm going to object to that. He doesn't—I'm going to tell him to take the Fifth Amendment at this time. I'm going to ask for a mistrial. She's asking him if he ever had something at some prior occasion that might constitute a crime before this Court and Jury.

I'm making a motion for mistrial, Your Honor. I would like to approach the Sidebar.

(Record, vol. III at 68–70). At this point, a bench conference was held. The trial court ruled that the question was a proper one for cross-examination but agreed with defense counsel that it was broad enough in scope to permit the appellant to invoke his Fifth Amendment privilege against self-incrimination; however, he denied appellant's motion for a mistrial. The government agreed to withdraw the question and phrase it more narrowly. The cross-examination continued:

BY MRS. COLE:

Q. Mr. Hernandez, on April 5th, 1979, did you have in your possession tablets of methaqualone or quaaludes?

A. I might have had them, but I wasn't of knowledge of it.

Q. Did you ever have possession of quaaludes or methaqualone tablets other than what has been referred to in the boxes marked as Government's Exhibits 3–A, B, and C?

A. Could you repeat that, ma'am?

Q. Did you ever have possession of methaqualone tablets or quaaludes in your possession on April 5th other than what has been the subject—other than what was included in the boxes entered as Government's evidence 3–A, 3–B, and 3–C?

. . . . .

A. I might have had, but no knowledge of it.

(Record, vol. III at 75–76).

The government then produced the briefcase seized from appellant's truck. He identified the briefcase as his and admitted that white tablets bearing the inscription "Rorer 714" were his sleeping pills. Furthermore, on rebuttal a DEA agent, Baggett, testified that the tablets had been seized from appellant's truck and were identical in physical appearance and inscription to the tablets in the three packages. Appellant's attorney objected several times to the production and admission into evidence of the briefcase and its contents on the ground that they were not proper vehicles for impeachment. The district court overruled all of his objections.

## II. DISCUSSION

A. Admissibility of illegally seized evidence for purpose of impeachment.

The rule governing the admission of evidence illegally seized and otherwise subject to suppression for purposes of impeaching the accused's trial testimony has experienced a lengthy evolutionary process. It is

appropriate to examine in some detail the prominent Supreme Court decisions on this subject because the facts in this case highlight the tension between the first decision on the subject and the most recent.

In *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), the defendant took the stand and denied any knowledge of the contents of the packages which he was carrying. They actually contained cocaine. On cross-examination, the government asked the defendant whether he had ever seen cocaine before. Defendant's attorney objected to the question but the objection was overruled and defendant replied "no." The government then introduced into evidence a can of cocaine which had been illegally seized from defendant's apartment and which had been excluded from the government's case-in-chief. The Supreme Court reversed Agnello's conviction:

> [T]he contention that the evidence of the search and seizure was admissible in rebuttal is without merit. In his direct examination, Agnello was not asked and did not testify concerning the can of cocaine. In cross-examination, in answer to a question permitted over his objection, he said he had never seen it. He did nothing to waive his constitutional protection or to justify cross-examination in respect of the evidence claimed to have been obtained by the search. As said in *Silverthorne Lumber Co. v. United States*, 251 U.S. [385] 392, 40 S.Ct. 182, 64 L.Ed. [319] 322, 24 A.L.R. 1426: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all." The admission of evidence obtained by the search and seizure was error, and prejudicial to the substantial rights of Frank Agnello.

269 U.S. at 35, 46 S.Ct. at 7. On the basis of *Agnello* alone, we might hold that the admission of the evidence seized from appellant's briefcase was error. Not only do the facts in this case closely parallel those in *Agnello*, but the sweeping statement that illegally seized evidence should not be used

at all would seem to foreclose the use of the evidence in this case; however, this latter statement has been rejected and *Agnello* otherwise limited. *See United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).

The first case to modify *Agnello* is *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), where the defendant, accused of narcotics sales, made the sweeping statement on direct examination that he had never purchased, sold or possessed any narcotics. The government was allowed to cross-examine about heroin illegally seized from his home two years before. At that time the evidence had been suppressed. The trial court instructed the jury that the evidence was admitted for the limited purpose of impeaching the defendant's credibility. The Supreme Court held that the admission of the evidence was proper. The Court reasoned that the exclusionary rule was never intended as a shield for the defendant to make sweeping untrue statements without fear of contradiction. The Court appeared to distinguish *Agnello* on the ground that the evidence admitted against Walder was unrelated to the crime charged. *See* 3 W. LaFave *Search and Seizure* § 11.6 (1978).

The next case was *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), where the trial court admitted certain statements of the accused taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to impeach the accused's contradictory trial testimony. The Supreme Court held that *Walder* was not limited to impeachment by collateral matters. A defendant may be impeached by matters bearing directly on the crimes charged. The Court emphasized that while an accused has the right to testify in his own behalf, he is under the same obligation as any other witness to tell the truth and that his credibility may be impeached by prior inconsistent statements. The majority rejected the argument that the admission of the statements would undermine the purpose of the exclusionary rule: "Assuming that the exclusionary rule

has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." 401 U.S. at 225, 91 S.Ct. at 645.

Finally, in *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), the defendant and a travelling companion, McLeroth, entered the Miami International Airport on a flight from Peru. Havens cleared Customs, but McLeroth was detained and searched. The search revealed a quantity of cocaine in pockets sewn into his undershirt. McLeroth implicated Havens in the scheme to smuggle in the cocaine. DEA agents then arrested Havens and searched his luggage, without a warrant. The agents found a tee shirt from which pieces had been cut that matched the pockets sewn to McLeroth's tee shirt; however, the tee shirt and other evidence were suppressed. McLeroth pleaded guilty to one count of the indictment and testified for the government at Havens' trial. Havens took the stand in his own defense. His testimony on direct was as follows:

"Q. And you heard Mr. McLeroth testify earlier as to something to the effect that this material was taped or draped around his body and so on, you heard that testimony?

"A. Yes, I did.

"Q. Did you ever engage in that kind of activity with Mr. McLeroth and Augusto or Mr. McLeroth and anyone else on that fourth visit to Lima, Peru?

"A. I did not." App. 34.

On cross-examination, Havens testified as follows:

"Q. Now, on direct examination, sir, you testified that on the fourth trip you had absolutely nothing to do with the wrapping of any bandages or tee shirts or anything involving Mr. McLeroth; is that correct?

"A. I don't—I said I had nothing to do with any wrapping or bandages or anything, yes. I had nothing to do with anything with McLeroth in connection with this cocaine matter.

"Q. And your testimony is that you had nothing to do with the sewing of the cotton swatches to make pockets on that tee shirt?

"A. Absolutely not.

"Q. Sir, when you came through Customs, the Miami International Airport, on October 2, 1977, did you have in your suitcase Size 38–40 medium tee shirts?" App. 35.

An objection to the latter question was overruled and questioning continued:

"Q. On that day, sir, did you have in your luggage a Size 38–40 medium man's tee shirt with swatches of clothing missing from the tail of that tee shirt?

"A. Not to my knowledge.

. . . . .

"Q. Mr. Havens, I'm going to hand you what is Government's Exhibit 9 for identification and ask you if this tee shirt was in your luggage on October 2nd, 1975 [sic]?

"A. Not to my knowledge. No." App. 46.

446 U.S. at 622, 100 S.Ct. at 1914, 64 L.Ed.2d at 563.

On rebuttal, the district court admitted into evidence the tee-shirt seized from Havens' luggage and instructed the jury to consider it only for impeaching his credibility. The jury found Havens guilty. This court reversed. *United States v. Havens*, 592 F.2d 848 (5th Cir. 1979). In *Havens*, this court distilled two requirements from *Agnello* and *Walder* regarding the use of illegally seized evidence to impeach the accused's trial testimony. First, the evidence must be offered to contradict a particular statement made by the accused during *direct* examination. "It cannot be smuggled into evidence by the prosecutor on cross-examination." *Id.* at 851. Second, the evidence must contradict a particular statement made by the accused. We held that the testimony in *Havens* did not satisfy that test.

The Supreme Court reversed our decision in *Havens*. The Court noted that *Agnello* has been limited. The Court rejected the

rule that illegally seized evidence may be used to impeach only defendant's direct testimony. The obligation to testify truthfully adheres to testimony given on proper cross-examination no less than to testimony on direct examination. The Court held:

> [T]hat a defendant's statements made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment by the government, albeit by evidence that has been illegally obtained that is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt.

446 U.S. at 627, 100 S.Ct. at 1917, 64 L.Ed.2d at 566. The Court then held that the cross-examination of Havens was entirely proper in view of his denial on direct examination that he engaged in draping material around McLeroth's body.

Therefore, after *Havens*, the proper inquiry is whether the cross-examination which elicits the statements to be impeached by the illegally seized evidence is "proper," i. e., whether it is within the scope of the direct evidence.

Before we can apply the *Havens* standard to this case, we must resolve a dilemma posed by *Agnello*. Although *Agnello* has been practically eviscerated by subsequent decisions, it has not been overruled. The facts in *Agnello* are very similar to the facts in this case. In each case on direct examination the defendant simply denied any knowledge of the contents of the package which he was charged with possessing. On cross-examination, the prosecution inquired into the defendant's familiarity with the drug at issue, and in the instant case asked a more particular question, i. e., whether the defendant had possessed any of the quaalude tablets on the day in question. When the defendant denied any knowledge of drugs, the government introduced other drugs seized from the defendant's posses-

sion to impeach his credibility. In *Agnello*, the drugs came from defendant's residence, while in this case the drugs came from appellant's briefcase found in his truck. In *Agnello*, the Court held that the defendant had done "nothing ... to justify cross-examination in respect of the evidence claimed to have been obtained by the search." 269 U.S. at 35, 46 S.Ct. at 7. While we might conclude that the *Havens* analysis supplants *Agnello*'s holding, *Havens* seems to reaffirm *Agnello* with respect to its particular facts. The majority stated, "The implication of *Walder* is that *Agnello* was a case of cross-examination having too tenuous a connection with any subject opened upon direct examination to permit impeachment by tainted evidence."[2] 446 U.S. at 625, 100 S.Ct. at 1916, 64 L.Ed.2d at 565. In view of the force of *Havens* and its criticism of *Agnello*, however, a disposition of this case solely on the basis of its factual similarity with *Agnello* would be precarious. The majority's lip service to *Agnello* might best be viewed as an attempt to reconcile prior cases, rather than an endorsement of *Agnello*'s holding. We find it significant that the *Havens* dissenters pointed out that the *Agnello* holding could not stand up under the *Havens* test, and that the *Agnello* evidence would have been admissible under the *Havens* analysis: "[t]he cross-examination about Agnello's previous connection with cocaine was reasonably related to his direct testimony that he lacked knowledge that the commodity he was transporting was cocaine." 446 U.S. at 630, 100 S.Ct. at 1918, 64 L.Ed.2d at 568 (Brennan, J., dissenting). We find it significant that the dissent apparently made no impression on the *Havens* majority. Therefore, we proceed to an independent analysis of the instant facts under the *Havens* standard.

 On direct examination, appellant denied any knowledge that the packages

---

**2.** The facts in our case actually fall somewhere between *Agnello* and *Havens*. The narrow question on cross-examination—whether the appellant *possessed* other quaalude tablets than the ones contained in the packages on the *day in question*—has a closer nexus with the

appellant's direct testimony than the broad question in *Agnello*—whether the defendant had *ever seen* cocaine before. The question, however, does not have as close a nexus to the direct testimony as the questions in *Havens*.

contained methaqualone. Instead he testified that he believed the packages contained Greek statues. The questions posed in cross-examination inquired into appellant's familiarity with drugs, specifically methaqualone. Whether the defendant was familiar with the drug methaqualone certainly related to appellant's knowledge of the contents of the packages. We can conclude that the question was reasonably suggested by appellant's direct testimony. The more specific question concerning appellant's possession of quaalude tablets on the day in question even more clearly related to his knowledge of the contents of the packages. That question also was reasonably suggested by his denials on direct examination. Appellant's responses on cross-examination—that he had not seen a quaalude tablet on the day in question and, if he had possessed any that day, he had no knowledge thereof—were contradicted by the evidence seized from his briefcase. Therefore, the admission of the illegally seized evidence for purposes of impeaching appellant's trial testimony was not error.[3]

B. Defendant's counsel's reference to the Fifth Amendment privilege during the government's cross-examination.

■ Appellant complains that the government asked questions calculated to force appellant to invoke his Fifth Amendment privilege against self-incrimination, and attempted to build its case upon impermissible inferences to be drawn therefrom. We find no merit to this argument. The exchange in question occurred when the government asked appellant on cross-examination whether he had *ever* possessed methaqualone or quaaludes. Appellant's attorney, in the presence of the jury, objected and stated that he would advise his client to take the Fifth Amendment. Appellant himself never invoked the privilege or answered the question. The question

was withdrawn and rephrased, and the trial court instructed the jury to disregard any comments of counsel made regarding the question.

Before addressing the merits of the alleged error, we do not believe that defense counsel should be allowed to put potentially prejudicial material before the jury in this manner and then assert error on appeal. Assuming that the government's questioning did entitle appellant to invoke his Fifth Amendment privilege, the proper course would be to object to the question and take the matter up outside the presence of the jury. In this manner, any mention of the privilege against self-incrimination in the presence of the jury might be avoided altogether, as it would have been in this case.

■ Assuming that the reference to the Fifth Amendment in the jury's presence was unavoidable and that appellant's counsel's statement that he would advise his client to invoke the privilege is equivalent to the client actually invoking the privilege, there was no error. It is true that the prosecution may not build its case on the misleading and unfair inferences which the jury may draw from a witness who invokes the privilege against self-incrimination by calling to the stand a witness whom the prosecution knows will assert the privilege. *See, e. g., Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). However, the rule is different where the government cross-examines the accused who takes the stand in his defense.

[W]hen a defendant has voluntarily waived his Fifth Amendment privilege by testifying in his own behalf, the rationale for prohibiting privilege-invoking queries on cross-examination does not apply. The defendant has chosen to make an issue of his credibility; he has elected to take his case to the jury in the most direct fashion. The government, accordingly, has a right to challenge the defend-

---

**3.** Appellant also argues that even assuming that the illegally seized evidence was admissible for impeachment purposes, its probative value was substantially outweighed by its prejudicial effect and should have been excluded.

Fed.R.Evid. 403. Having reviewed the record, we do not believe that the district court abused its discretion under Rule 403 in admitting the evidence. *See United States v. Benton,* 637 F.2d 1052 (5th Cir. 1981).

ant's story on cross-examination.... The government may impeach the defendant by developing inconsistencies in his testimony; the government may also successfully impeach him by asking questions which he refuses to answer. If the refusals could not be put before the jury, the defendant would have the unusual and grossly unfair ability to insulate himself from challenges merely by declining to answer embarrassing questions. He alone could control the presentation of evidence to the jury.

*United States v. Hearst*, 563 F.2d 1331, 1341–42 (9th Cir. 1977), *cert. denied* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978) (citation omitted). To the same effect, *see also United States v. Beechum*, 582 F.2d 898, 907–09 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (citing *Hearst* with approval). The prosecutor's range of inquiry is not unlimited. The government's questions must be "reasonably related" to the subjects covered by the defendant's direct testimony. *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971); *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 713, 2 L.Ed.2d 758 (1958); *United States v. Hearst, supra.* Whether appellant had ever possessed methaqualone or quaaludes before is reasonably related to his direct testimony that he did not know what was in the packages and did not intend to distribute controlled substances. Specifically, if he had possessed them and was familiar with them, it would tend to discredit his claimed ignorance of the contents of the packages. We believe that the question was proper. Appellant had waived his privilege by taking the stand and neither appellant nor his attorney was entitled to invoke the privilege in response to the question.[4] *United States v. Hearst, supra; United States v. Beechum, supra.* "Any prejudice deriving from the invocation of the privilege is therefore attributed to [ap-

pellant's] decision to testify." *United States v. Beechum*, 582 F.2d at 909. Furthermore, any prejudice was more than overcome by the withdrawal of the question and the curative instruction of the trial court.

C. Admission of co-conspiratorial hearsay and sufficiency of the evidence.

■ Appellant complains that there was insufficient independent evidence of a conspiracy and his participation therein to admit into evidence Koutrumbas' hearsay statements to the agents under the standard for admitting co-conspirator hearsay established in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). We have reviewed the record and conclude that the statements were properly admitted. Likewise, there was sufficient evidence to support the conviction. The district court did not err in denying appellant's motion for a judgment of acquittal.

For the foregoing reasons, appellant's conviction is

AFFIRMED.

THOMAS A. CLARK, Circuit Judge, dissenting:

Respectfully, I dissent. The only permissible theory of relevance underlying the introduction of the suppressed evidence was to contradict the defendant's testimony on cross-examination, to the effect that he did not knowingly possess quaaludes on the day in question. Once he had said that, the door was open for impeachment by the introduction of the suppressed evidence. I believe, however, that Hernandez was brought to this admission by an improper line of cross-examination. The prosecutor was allowed to range too far afield from matters testified to on direct, as a consequence of which Hernandez was forced either to claim his fifth amendment privilege or to explain as best he could matters that

---

4. Although the district judge correctly ruled that the question was proper, he also ruled, incorrectly, that appellant was entitled to assert his privilege against self-incrimination. Appellant cannot benefit from the district

court's erroneous ruling. "[I]f the court had ruled correctly and not allowed him to invoke the Fifth Amendment, he could have refused to respond only on peril of contempt." *United States v. Beechum*, 582 F.2d at 909.

were unrelated both to the offense charged and to what he had testified to on direct. Had the prosecutor been confined to "proper cross-examination reasonably suggested by the defendant's direct examination," *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559 (1980), Hernandez would not have been forced to make a choice that had an all too predictable outcome.

Of course a defendant's familiarity with and possession of drugs on other or similar occasions may bear some degree of relevance to the issue of his involvement in a drug transaction on a given occasion, whether it is knowing or innocent. But it simply does not follow that because one may be aware of the nature of certain contraband generally that one also is aware of the concealed contents of a certain package, and yet this was the premise for the government's line of cross-examination. The probative value of information concerning any other instances of knowing possession of contraband similar to that actually transferred is simply "outweighed by the danger of unfair prejudice" and therefore should have been inadmissible under F.R.E. 403.

Before the adoption of the Federal Rules of Evidence and Rule 403, inquiry would have focused on whether the matters the government asked about—whether the defendant had ever been in possession of any other similar contraband—were "collateral" to the facts in issue as to which Hernandez testified on direct—that he was unaware of the true contents of the packages he transferred. Under the prevailing test the issue would have been whether "the fact, as to which error is predicated, [*i. e.*, the admission into evidence of Hernandez' possession of the pills in his briefcase, could] have been shown in evidence for any purpose independently of the contradiction?" *Weinstein's Evidence*, ¶ 607[05], *quoting from* 3 Wigmore, *Evidence* § 1003 at 657 (3d ed. 1940). Under this test matters would not be collateral that were (1) material to facts in issue and (2) facts independently admissable for impeachment purposes. *Id.* As for (1), knowing possession of what is in one's own bag bears no *material* relation to knowledge of what is in another package, and as for (2), F.R.E. 608(b) expressly bars proof by extrinsic evidence of similar bad acts for purposes of impeaching testimony concerning the conduct in question. These limits on the impeachment use of collateral evidence are carried forward in the balancing of probative value vs. danger of unfair prejudice under F.R.E. 403 that the district court should have resolved against the government's whole line of inquiry. *Weinstein's Evidence*, ¶ 607 [02].

All agree that an accused should not be allowed to turn the shield of the exclusionary rule into a perjury sword. For this reason it should not matter whether that which is sufficient to dispel the protection of the rule is first elicited by his own lawyer on direct, as in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), or by government counsel on cross-examination, as in *Havens, supra*. But there ought to be a substantial connection between what is said and what the government may then seek to prove. *Harris* involved flatly contradictory statements and *Havens* contradictory behavior. Here the relationship between what Hernandez testified to on direct and what the government used to impeach was far more tenuous, and indeed admitted of numerous possibilities, however slight, consistent with Hernandez' innocence. To justify today's result on the strength of Hernandez' direct testimony extends the *Harris-Havens* rationale farther than I have seen it extended before, overruling *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), in the process. And long before Hernandez was pushed on cross-examination to what I concede was the point of no return, the district court should have restricted the scope of examination to a more relevant line of inquiry, less susceptible to the danger of unfair prejudice.[1]

---

1. Thus I agree with the majority that the admission of the pills into evidence, as probative

of his by-then highly implausible responses to extended questioning beginning with unrelated

involvement with quaaludes, did not violate F.R.E. 403, *ante*, n.3. But the government could not have reached the question it wanted to ask without asking a great many questions it should not have been permitted to ask.