**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas E. RACKSTRAW,**
**Defendant–Appellant.**

**No. 92–1122.**

United States Court of Appeals,
Tenth Circuit.

Oct. 25, 1993.

Rehearing Denied Nov. 24, 1993.

Neil MacFarlane, Westminster, CO, for defendant/appellant.

John M. Hutchins, Asst. U.S. Atty., Denver, CO (Michael J. Norton, U.S. Atty., and Guy Till and Kathleen M. Tafoya, Asst. U.S. Attys., with him on the brief), for plaintiff/appellee.

Before EBEL and KELLY, Circuit Judges, and VRATIL, District Judge.[*]

EBEL, Circuit Judge.

On direct appeal, the defendant-appellant, Thomas E. Rackstraw, raises evidentiary and constitutional challenges to his conviction on three counts for crimes involving the transportation and distribution of crack cocaine. We affirm his conviction, holding: (1) that the district court's admission of evidence of Rackstraw's alleged sales of crack in Fort Worth, Texas, did not violate Federal Rule of Evidence 404(b); (2) that the district court did not err in denying Rackstraw's Fifth Amendment objection to questions concerning his alleged Fort Worth crack sales or in forcing him to claim his Fifth Amendment privilege in front of the jury; (3) that there was no reversible error in allowing the government to call a probation officer to testify as to the operation of the United States Sentencing Guidelines; and (4) that Rackstraw's sentence under the guidelines was not so disproportionate to the sentence received by one of the drug ring's leaders who pled guilty as to violate the Eighth Amendment.

## FACTS

The charges on which Rackstraw was convicted stem from his transportation of crack cocaine to Denver for Malcolm Green. Green originally began transporting crack cocaine to Denver, Colorado in 1987. Although Green initially transported the crack himself, he eventually hired others to transport the drugs to Denver for him.

In November 1990, Green entered into an agreement with Eddie "E–Macc" Williams

[*] The Honorable Kathryn H. Vratil, District Judge for the District of Kansas, sitting by designation.

whereby Williams would supply a quantity of crack cocaine to Green and Green would help sell the drugs in Denver. Williams told Green that someone would drive to Denver with the crack the next morning.

The next day, Green picked up Williams at his hotel and they returned to Green's apartment. While at the apartment, Green received a page for Williams. Williams and Green gave the caller directions to the apartment. The defendant-appellant, Thomas E. Rackstraw, arrived at the apartment a short time later.

Rackstraw carried an ice chest into the apartment and set it down on a table. He then went "off in the corner by the window and sat down." Williams opened the cooler. Green looked in and saw milk and sandwich fixings, but did not see any crack. He asked Williams where the drugs were. Williams took out all of the food, and then removed sixteen to sixteen-and-a-half ounces of crack. Williams said that the spilled milk in the cooler would hide the crack. Although Rackstraw said nothing, there was testimony that the discussion about the crack took place in his presence, while he was in the kitchen and they were in the living room nearby.

At Rackstraw's trial, the district court admitted evidence of Rackstraw's alleged sales of crack in Fort Worth. The evidence showed that on September 25, 1990, an undercover detective, Edward Salame, purchased crack cocaine from Rackstraw in Fort Worth. In connection with that transaction, Rackstraw called Williams' pager number. When Williams did not respond, Rackstraw called the number of F & F Car Company, a business owned by Ron Fisher. Salame then drove to F & F Car Company with Rackstraw and completed the crack purchase.

Rackstraw sold Salame additional crack on December 5, 1990. At that time, Rackstraw told Salame that he was a runner for Williams and Ron Fisher and that he transported a lot of cocaine. Later, in January 1991, Rackstraw told Salame that he had conducted drug runs for Ron Fisher and his

organization to various places, including Denver, Colorado.

Rackstraw and twenty-one others were indicted on September 13, 1991. He was charged in a superseding indictment on January 10, 1992, with traveling in interstate commerce to distribute crack cocaine in violation of 18 U.S.C. §§ 2, 1952 and 21 U.S.C. §§ 841(a)(1) and 846; with aiding and abetting the distribution of crack cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii); and with conspiring, along with three others, to distribute more than fifty grams of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii). He was tried on March 2–5, 1992, along with his co-defendant Sharon Moore. The jury convicted Rackstraw on all three counts. On April 24, 1992, Rackstraw was sentenced to two terms of 132 months for counts 13 and 37 and 16 months on count 36, with all sentences to run concurrently.

Rackstraw appeals his convictions, pointing to four alleged errors at trial. Because we find no reversible error, we affirm his convictions and sentence.

## DISCUSSION

### I. OTHER ACTS EVIDENCE

■ Rackstraw first challenges the admission under Federal Rule of Evidence 404(b) [1] of evidence that he sold crack to undercover agent Salame in Fort Worth. We review the decision to admit "other acts" evidence under Fed.R.Evid. 404(b) for an abuse of discretion. *United States v. Record*, 873 F.2d 1363, 1373 (10th Cir.1989). When offering 404(b) evidence, the government " 'must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the evidence of other acts.' " *Record*, 873 F.2d at 1373 (quoting *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986)). Concomitantly, the trial court must identify specifically the purpose

---

1. Rule 404(b) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

for which the evidence is admitted. *Id.* There must be a clear and logical connection between the "other acts" evidence and the case being tried. *Id.*

Here, the government adequately articulated, and the district court specifically identified, the purpose behind the admission of evidence of the Fort Worth crack sales: the evidence was offered to refute Rackstraw's claim that he thought he was delivering only a car to Denver and that he did not know the cooler contained crack. The court therefore clearly identified that the Fort Worth crack sales were being admitted for the purpose of showing "intent, ... knowledge, ... or absence of mistake or accident" under Rule 404(b).

Once we have ascertained that the government and the district court have identified a specific basis for the admission of the 404(b) evidence, we determine whether admission on that basis was proper. To do so, we apply a four-part test, which requires that:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a Rule 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) pursuant to Fed. R.Evid. 105, the trial court shall, upon request, instruct the jury that the evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Jefferson,* 925 F.2d 1242, 1258 (10th Cir.) (citing *Record,* 873 F.2d at 1374 (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988))), *cert. denied,* —— U.S. ——, 112 S.Ct. 238, 116 L.Ed.2d 194 (1991). Applying these standards to Rackstraw's case, we cannot find that the district court abused its discretion in admitting the evidence of Rackstraw's sales of crack to Salame in Fort Worth.

The government offered the evidence for a proper purpose because Rule 404(b) allows evidence of other acts for the purpose of intent, knowledge and lack of mistake. The evidence is also relevant. We have long recognized the relevance of prior crimes in the context of narcotics violations where the uncharged misconduct is close in time and similar in method to the charged scheme and where knowledge or intent was at issue. *Record,* 873 F.2d at 1375 (citing *United States v. Bridwell,* 583 F.2d 1135, 1140 (10th Cir.1978)); *see also United States v. Harrison,* 942 F.2d 751, 760 (10th Cir.1991). Here, the Fort Worth crack sales occurred within months of, and indeed overlapped with, Rackstraw's transportation of crack to Colorado. The first Fort Worth sale took place on September 25, 1990; Rackstraw delivered the crack to Williams and Green in Colorado in November 1990; and the second Fort Worth sale occurred on December 5, 1990.

Rackstraw's crack sales in Fort Worth also were similar in method to his transportation of crack to Colorado. Both schemes involved the same drug and the same players in similar roles: in both cases, Rackstraw served as the middle man in a drug transaction, delivering crack supplied by Williams and Fisher to a buyer. The evidence showed that Rackstraw knew that he was working for Williams and Fisher on both occasions. During the first Fort Worth drug transaction, Williams supplied the drugs that Rackstraw sold to Salame, the sale took place near a business owned by Ron Fisher, and Rackstraw indicated that next time, Rackstraw would take Salame straight to "Ron" [Fisher]. The evidence also showed in the instant case that Rackstraw made the trip to Colorado on behalf of Williams and Fisher.

A defendant's prior drug transactions may be relevant to whether the defendant intended to engage in or had knowledge of the charged scheme, where the schemes involve the same people. *See Harrison,* 942 F.2d at 759–60 (evidence that defendant had engaged in drug trafficking on previous occasions with his supplier was relevant to show that he knew he was engaged in, and intended to engage in, a conspiracy to possess with intent to distribute drugs with his supplier and others on the occasions charged in the indictment, where the uncharged transactions were close in time to the charged transactions); *United States v. Pitre,* 960 F.2d 1112, 1117–19 (2d Cir.1992) (deeming evidence of the Pitre brothers' prior drug transactions

with two co-defendants relevant to prove their intent or knowledge, where the Pitres contended that although they were at arrest scene, they did not intend to conspire with the co-defendants to possess heroin with intent to distribute).

Next, we weigh the probative value against the unfair prejudice of the evidence. The evidence was clearly probative on the issue of Rackstraw's knowledge, showing that Rackstraw—contrary to the impression he gave during his direct testimony—was not a naive, unsophisticated mechanic who drove a car to Denver that happened to contain cocaine. Rather, the evidence of the Fort Worth crack sales showed that Rackstraw was intimately familiar with drug running in general and Williams and Fishers' drug operation in particular. The evidence suggested that it was highly unlikely that Rackstraw was unaware that he was smuggling crack. Although the evidence was prejudicial to Rackstraw, we cannot say that it was unfairly prejudicial, much less that any unfair prejudice "substantially" outweighed its strong probative value.

Finally, the district court instructed the jury to consider the evidence of the Fort Worth crack sales only on the issue of Rackstraw's knowledge, intent, or lack of accident or mistake. All of the criteria set forth in *Record* and *Jefferson* have been met here. Thus, we cannot say that the district court abused its discretion in admitting the evidence.

## II. FIFTH AMENDMENT PRIVILEGE

■ Rackstraw next contends that the district court erred in denying his Fifth Amendment objections to the government's questions about his alleged Fort Worth crack sales and in forcing him to claim his Fifth Amendment privilege in front of the jury. Rackstraw was indicted in the United States District Court for the Northern District of Texas on two counts of selling crack in Fort Worth to undercover agent Salame on January 10, 1992. These charges were still pending at the time of trial in the instant case. The court permitted the government to ask Rackstraw details about the sales, including whether he had sold crack to Salame as alleged in that indictment. After the court rejected Rackstraw's claim of the Fifth Amendment privilege, Rackstraw's attorney nevertheless instructed him not to answer. Consequently, the court held Rackstraw in contempt for refusing to testify. We conclude that the district court did not err in denying Rackstraw's claim of the Fifth Amendment privilege.

"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." *McGautha v. California*, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971) (citing *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *Fitzpatrick v. United States*, 178 U.S. 304, 314–16, 20 S.Ct. 944, 948–49, 44 L.Ed. 1078 (1900)), *vacated in part on other grounds*, 408 U.S. 941–42, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972); *United States v. Vreeken*, 803 F.2d 1085, 1093 (10th Cir.1986), *cert. denied*, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *United States v. Worth*, 505 F.2d 1206, 1210 (10th Cir.1974), *cert. denied*, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975); *Sinclair v. Turner*, 447 F.2d 1158, 1165 (10th Cir.1971), *cert. denied*, 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590 (1972). During his direct examination, Rackstraw testified that he was delivering only the car to Denver and that he did not know the cooler contained crack. As we held in Part I, the Fort Worth crack sales were relevant to the issue of Rackstraw's knowledge as to whether he was transporting crack and intent to commit the charged crimes. Because the Fort Worth sales tended to show knowledge and intent, they were reasonably related to Rackstraw's testimony. The district court therefore did not err in denying Rackstraw's claim of the Fifth Amendment privilege.

Given that Rackstraw was not entitled to invoke the privilege against self-incrimination when asked questions about the Fort Worth sales, we hold that the district court did not err in forcing him to invoke the Fifth Amendment in front of the jury. If the district court had not allowed the questioning as to the Fort Worth sales, Rackstraw would

have been able to mislead the jury with his testimony on direct, which suggested that he was an innocent dupe who had no idea he was smuggling drugs.

When a defendant has voluntarily waived his Fifth Amendment privilege by testifying in his own behalf, the rationale for prohibiting privilege-invoking queries on cross-examination does not apply so long as the questions are "reasonably related" to the defendant's direct testimony. *United States v. Hernandez*, 646 F.2d 970, 978 (5th Cir. Unit B), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 638, 70 L.Ed.2d 617 (1981)). As the court noted in *Hernandez*,

> The defendant [who testifies] has chosen to make an issue of his credibility.... The government, accordingly, has a right to challenge the defendant's story on cross-examination.... The government may impeach the defendant by developing inconsistencies in his testimony; the government may also successfully impeach him by asking questions which he refuses to answer. *If the refusals could not be put before the jury, the defendant would have the unusual and grossly unfair ability to insulate himself from the challenges merely by declining to answer embarrassing questions.* He alone could control the presentation of evidence to the jury.

*Hernandez*, 646 F.2d at 978–79 (emphasis added) (citing *U.S. v. Hearst*, 563 F.2d 1331, 1341–42 (9th Cir.1977), *cert. denied* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978)); *see also Neely v. Israel*, 715 F.2d 1261, 1265 (7th Cir.1983) (holding in habeas corpus case that the defendant waived his right to invoke the Fifth Amendment during his direct testimony and that " '[a]ny prejudice deriving from the invocation of the privilege is ... attributed to [his] decision to testify' ") (quoting *United States v. Beechum*, 582 F.2d 898, 909 (5th Cir.1978) (en banc) *cert. denied* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)), *cert. denied* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). We hold that the

district court did not abuse its discretion in requiring Rackstraw to invoke the Fifth Amendment in front of the jury.

### III. ADMISSION OF PROBATION OFFICER'S TESTIMONY

■ Rackstraw asserts that the district court erred in calling a probation officer, Anthony Merlo, to testify as to what Green's sentence would have been had he not testified for the government. Rackstraw contends that this was error because Merlo's testimony was irrelevant and misled the jury.[2]

During cross-examination of Green, defense counsel inquired about the deal that Green received from the government in exchange for his cooperation in testifying against Rackstraw:

> Q. (BY MR. MACFARLANE) You were charged with conspiracy along with Mr. Rackstraw, weren't you?
>
> A. Yes.
>
> Q. On seven of those separate offenses, including that conspiracy charge, that's a possible punishment of life imprisonment?
>
> A. Yes.
>
> Q. You avoided life imprisonment, didn't you?
>
> A. Yes.

Tr. 152–53. Rackstraw's attorney also asked Green whether his attorney informed him that the court could make his sentences run consecutively, although the court interrupted before Green could answer.

The government then called Anthony Merlo, a probation officer, to explain the Sentencing Guidelines to the jury. Merlo testified that, indeed, Green faced thirty counts against him, but that all but two had been dismissed. He noted that the terms "consecutive" and "concurrent" are not used in the guidelines, and that "grouping rules" are used instead. He stated that as a result of

---

2. Rackstraw also contends that it was error to admit Merlo's testimony because Rackstraw was not informed that Merlo would testify until the morning that he appeared in court. However, the district court granted to Rackstraw the only relief that he sought concerning the govern-

ment's last-minute designation: upon Rackstraw's request, the district court permitted him to delay his cross-examination of Merlo until the next day. We do not find the district court's decision to allow Merlo's testimony erroneous on this ground.

the grouping rules, Green would have been sentenced under the same imprisonment range, 235 to 300 months, whether he pleaded guilty to all thirty counts or whether he pled to just the two counts that were part of his agreement with the government. Thus, the dismissal of the twenty-eight counts had no impact. Merlo also testified that the top end of the range under which Green could have been sentenced was "something like maybe 23" years. According to Merlo, the government had moved to have Green's sentence reduced to fourteen years on the basis of his substantial assistance to the prosecutors.

We review the district court's ruling on the relevance of this evidence only for an abuse of discretion, *United States v. Neal*, 718 F.2d 1505, 1509–10 (10th Cir.1983) (citations omitted), *cert. denied*, 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984). Green indicated that he believed that on seven of the offenses he was charged with, there was "a possible punishment of life imprisonment" and that he had avoided life imprisonment. Merlo's testimony that Green was never facing life imprisonment tends to rebut the testimony defense counsel elicited from Green.

In any event, even if it were error to have allowed Merlo's testimony, such error would be harmless. The judge instructed the jurors to consider Merlo's testimony on the issue of Green's credibility alone, and not to consider what sort of sentence Rackstraw might receive. In the absence of evidence to the contrary, we will presume that jurors remain "true to their oath and ... conscientiously observe the instructions and admonitions of the court." *United States v. Greschner*, 802 F.2d 373, 381 (10th Cir.1986) (quotations and citations omitted), *cert. denied*, 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). Consequently, in light of other strong evidence of Rackstraw's guilt, we conclude that the admission of Merlo's testimony over Rackstraw's relevance objection was harmless.

■ We next address Rackstraw's contention that Merlo's testimony was so misleading that it should have been excluded under Federal Rule of Evidence 403. Generally, we review the admission of evidence under Rule 403 only for an abuse of discretion. *See Neal*, 718 F.2d at 1510. However, since Rackstraw did not object on the ground of Rule 403 at trial, we review his Rule 403 claim only for plain error. For an error to be plain, it must be both obvious and substantially affect the defendant's rights. *See* Fed.R.Crim.P. 52(b); *United States v. Jefferson*, 925 F.2d 1242, 1254 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 239, 116 L.Ed.2d 194 (1991). It is not obvious that Merlo's testimony was misleading, nor did such testimony affect defendant's substantial rights, given that other strong evidence of his guilt was introduced at trial. We therefore find that the district court's admission of Merlo's testimony was not reversible error under Rule 403.

## IV. SENTENCING GUIDELINES AND THE EIGHTH AMENDMENT

■ Rackstraw asserts that his sentence under the Sentencing Guidelines was so disproportionate to the sentence received by Green as to constitute cruel and unusual punishment under the Eighth Amendment. At sentencing, Rackstraw pointed out that Green's testimony indicated that Green had transported approximately 1,040 ounces of crack annually between 1988 and 1990, while Rackstraw was convicted of transporting only sixteen-and-one-half ounces of crack to Denver on one occasion. Yet, Green received a sentence of fourteen years, while Rackstraw received a sentence of approximately eleven years. We hold that the sentencing disparity does not violate the Eighth Amendment.

Rackstraw does not assert that his sentence was outside the prescribed statutory limit, nor could he. He received two terms of 132 months for Count 37 (aiding and abetting the distribution of crack cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii)) and Count 13 (conspiring, along with three others, to distribute more than fifty grams of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1)). He received a sentence of 16 months on Count 36 (traveling in interstate commerce to distribute crack cocaine in violation of 18 U.S.C. §§ 2, 1952 and 21 U.S.C.

§§ 841(a)(1) and 846). All sentences are to run concurrently. These sentences fell within the Guideline ranges. Moreover, the district court gave Rackstraw a two-level reduction for being a minor participant under U.S.S.G. § 3B1.2(b) and sentenced him at the bottom of the applicable guideline range.

Any disparity between the sentence imposed on Green and that imposed on Rackstraw is easily explained by the fact that Green cooperated with the government in the prosecution of participants in William and Fisher's drug operations, while Rackstraw did not. *Cf. United States v. Trujillo*, 906 F.2d 1456, 1464–65 (10th Cir.) (holding that lesser sentence imposed on co-defendant did not constitute abuse of discretion where defendant was sentenced within the statutory and guideline range, and where co-defendant received reduction for acceptance of responsibility and for being a minimal participant), *cert. denied*, 498 U.S. 962, 111 S.Ct. 396, 112 L.Ed.2d 405 (1990). Rackstraw's sentence therefore is not unconstitutionally disproportionate to that received by Green.

## V. CONCLUSION

We find no reversible error. Consequently, we AFFIRM the judgment of the district court.