UNITED STATES of America,
Plaintiff–Appellee,

v.

Marmon Dennis RECORD,
Defendant–Appellant.

No. 88–1405.

United States Court of Appeals,
Tenth Circuit.

April 28, 1989.

**1364**

David E. O'Meilia, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him, on the brief), Tulsa, Okl., for plaintiff-appellee.

James L. Martin, Arlington, Tex., for defendant-appellant.

Before MOORE, ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

Marmon Dennis Record (Record) was convicted by a jury of conspiring to import cocaine and marijuana, in violation of 21 U.S.C. §§ 963, 960 & 952(a), and of conspiring to possess with intent to distribute and to distribute cocaine and marijuana, in violation of 21 U.S.C. §§ 846 & 841. The trial court sentenced Record to twenty-five years in prison on each of the two counts, the sentences to be served concurrently. Record appeals his convictions, invoking our jurisdiction under 28 U.S.C. § 1291.

*Background*

Considering the evidence in the light most favorable to the government as we must, *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985), the relevant facts may be summarized as follows:

From approximately summer 1980 until December 1982, indicted coconspirator Frank Palmero (Palmero), along with several others, imported three 500–700 pound loads of marijuana into Florida. The marijuana was obtained from Jamaican suppliers and flown into Florida. Palmero testified that this "smuggling network" was set up using the names of connections provided by defendant Record. Rec. vol. V at 323. Palmero also testified that the second load of marijuana brought into Florida was sold by Record.

In 1982, Record and unindicted coconspirator Boris Olarte (Olarte) arranged to import marijuana into Florida from Columbia by way of the Bahamas. In this arrange-

ment, Olarte would provide the marijuana and a landing strip in Colombia, while Record would furnish a plane, a Cessna 421, pilots, and pay $100 per pound for the marijuana. After being loaded with marijuana in Colombia, the plane would stop in the Bahamas, where Record would transfer the marijuana from the plane to a boat for transport to Florida. Record utilized connections with Bahamian authorities to maintain "security" for the operation. Once the drugs arrived in Florida, Record had "clients" to whom he could sell the marijuana for $280–$300 per pound.

In the summer of 1982, Olarte and Record imported 2000 pounds of marijuana into the United States, where Record sold it. Olarte and Record consummated a similar deal in fall 1982 involving 1500 pounds of marijuana. Record, Palmero, and indicted coconspirator Bobby Jamieson (Jamieson) helped to unload marijuana from at least one of these plane deliveries to the Bahamas. On at least one occasion, the Jamieson transported the marijuana to Florida in his boat, a 30–foot Rybovich.

Around December 1982, while using the same general method of operation, the activity of the participants expanded to include dealing in cocaine. Record, Palmero, and Olarte agreed to import 100 kilograms (kilos) of cocaine in the next transaction, but Olarte had difficulty with his cocaine source and instead substituted 1200 pounds of marijuana in this first intended cocaine deal. Apparently, this load of marijuana was dumped into the ocean and was never sold. The next transaction, in early 1983, successfully brought 115 kilos of cocaine and 500 pounds of marijuana into the United States. In this deal, Record, Jamieson, and Palmero helped to offload the plane in the Bahamas, and Jamieson transported the drugs to Florida by boat. Planning for the next importation of drugs began soon thereafter, with the discussions involving Record, Palmero, Olarte, and Olarte's wife, Clara Lacle (Lacle).

A few months later in 1983 or early in 1984, with Palmero taking a more active organizational role and piloting the plane, a Cessna 310, the operation smuggled into

Florida 290 kilos of cocaine and 400 pounds of marijuana. Record assisted in offloading the plane, and Jamieson transported the drugs to Florida by boat. In the 290–kilo deal, Record held back 20 to 25 kilos of Olarte's cocaine, claiming that they were lost. Olarte absorbed the loss and decided to exclude Record from the next planned deal, using Palmero and Jamieson instead to fill Record's former organizational and transportation roles.

In early 1985, Olarte, Palmero, and Jamieson brought 390 kilos of cocaine into Florida. Olarte, Palmero, and Jamieson met in Aruba around October 1986 to plan the importation of 400 to 500 kilos of cocaine into the United States. Olarte was arrested in November 1986 regarding participation in a different drug operation, but continued from his place of incarceration in the Tulsa county jail to try to organize the deal originally planned in Aruba.

After being imprisoned in Oklahoma, Olarte contacted Palmero by telephone in Florida, seeking money directly or through a drug deal. Palmero initially sent Olarte $4,000, and then Palmero met a second time in Aruba with, among others, Jamieson and Lacle. The parties agreed to pursue the cocaine importation deal, planned at the first meeting in Aruba, to raise funds for Olarte. In May 1987, however, Olarte began to cooperate with the government, and this cooperation led to the indictment and arrest of Palmero, Jamieson, and the defendant Record. Jamieson, Palmero, and Olarte negotiated pleas and testified for the government in return for consideration of such testimony at the time of their sentencing. Record was convicted by a jury and sentenced in January 1988.

Record seeks reversal of his conviction, arguing that 1) the evidence was insufficient to prove one continuous conspiracy as charged in the indictment, 2) the trial court unduly emphasized evidence harmful to the defense by instructing the jury that "using a telephone" could constitute an overt act underlying a conspiracy, 3) the trial court erred by advising the government before it rested that it had not proven venue, 4) the trial court failed to adequately define the

term "broader conspiracy" in its instructions to the jury, 5) the trial court erroneously admitted evidence of a prior bad act by Record, and 6) the government's closing argument unfairly implied that Record would commit future crimes if acquitted. We affirm.

## I.

Record argues that the government's proof constituted a fatal variance in that the evidence at trial showed four distinct conspiracies rather than the single conspiracy charged in the indictment. Specifically, Record contends that the first conspiracy consisted of a July 1980 agreement between Palmero and several unindicted individuals to import cocaine and marijuana into Florida. The second conspiracy, according to Record, involved an April 1983 agreement between himself, Palmero, Olarte, and Jamieson to import cocaine and marijuana into Florida, resulting in the two deals which brought into Florida first 115 kilos of cocaine and 500 pounds of marijuana, and then 290 kilos of cocaine and 400 pounds of marijuana. Record claims that this was the only conspiracy in which he was actively involved and that the other conspirators chose to cut him out of future dealings at that point due to the shortage of 20–25 kilos of cocaine. Record asserts that the third conspiracy surrounded the October 1985 agreement between Olarte, Jamieson, and Palmero to import 390 kilos of cocaine into Florida. Finally, according to Record, the fourth conspiracy was a May 1987 agreement between Olarte and Palmero for the purpose of accomplishing Olarte's escape from the Tulsa county jail.

A variance occurs when the trial evidence establishes facts different from those charged in the indictment. *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Such a

variance may be "fatal" or prejudicial if it "affects the substantial rights of the accused." *United States v. Morris*, 623 F.2d 145, 149 (10th Cir.), *cert. denied*, 449 U.S. 1065, 101 S.Ct. 793, 66 L.Ed.2d 609 (1980). Record claims two sources of prejudice. First, he cites *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1945), where the Supreme Court found a variance prejudicial in a thirteen-defendant "mass conspiracy" because "[t]he dangers of transference of guilt from one to another across the line separating conspiracies ... are so great that no one can really say prejudice to substantial right has not taken place." *Id.* at 773–74, 66 S.Ct. at 1252.

Record's primary assertion of prejudice, however, is that the claimed variance prevented the government from properly establishing venue in that only the "fourth conspiracy" touched the Northern District of Oklahoma, and Record argues he was not a party to that conspiracy. Venue in federal criminal cases is an element of the prosecution's case which must be proved, unlike the other elements, by a preponderance of the evidence. *United States v. Rinke*, 778 F.2d 581, 584 (10th Cir.1985). In a conspiracy, venue " 'lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators.' " *Id.* at 584–85 (quoting *United States v. Smith*, 692 F.2d 693, 697 (10th Cir.1982)). Thus, if the conspiratorial agreements or overt acts touching the Northern District of Oklahoma were part of a separate conspiracy not involving Record, venue there would be inappropriate. *See United States v. Durades*, 607 F.2d 818 (9th Cir.1979).

Whether the evidence was sufficient to establish a single conspiracy is a question of fact for the jury to decide.[1] *Dickey*,

---

1. The jury instruction entitled "Multiple Conspiracies," which included the entirety of Record's requested jury instruction regarding multiple conspiracies, instructed the jury in part:

 You are further instructed, with regard to the alleged conspiracy offense, that proof of

several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed be-

736 F.2d at 581. We review the sufficiency of the evidence by considering all the evidence, both direct and circumstantial, in the light most favorable to the government, drawing reasonable inferences and making credibility choices in support of the jury's verdict. *Id.* In order to find a single conspiracy, "the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal." *Id.* at 582. Significantly, this is not a case where the difficulty lies in inferring from circumstantial evidence such a common undertaking. The evidence is manifest and Record admits that he knowingly conspired with others to violate the drug laws, at least during his asserted "second conspiracy." Record argues instead that a variance is shown by differences in personnel, the passage of time between drug transactions, and his lack of participation in portions of the charged conspiracy. We disagree.

The proof summarized at the outset reflects a significant overlap in personnel, method of operation, and purpose throughout the period of the indictment such that the single, ongoing illegal scheme to import and distribute cocaine and marijuana for profit charged in the indictment may be inferred. *E.g., United States v. Gomez,* 810 F.2d 947, 955 (10th Cir.) (multiple drug transactions constituted single conspiracy), *cert. denied,* 482 U.S. 908, 107 S.Ct. 2488, 96 L.Ed.2d 379 (1987); *Dickey,* 736 F.2d at 582 (numerous marijuana and cocaine transactions over five-year period with varying participants considered single conspiracy); *United States v. Pilling,* 721 F.2d 286, 293 (10th Cir.1983) (numerous trips and changing personnel irrelevant when constant purpose to import drugs into the United States for profit); *United States v. Bridwell,* 583 F.2d 1135, 1141–42 (10th Cir.1978) (seven different drug transactions over substantial period of time

show continuous course of conduct representing a single conspiracy to sell drugs illegally); *United States v. Champion,* 813 F.2d 1154, 1166–67 (11th Cir.1987) (eighteen drug transactions over three-year period with one common participant considered single conspiracy as purpose and basic means of implementation consistent throughout).

Nevertheless, Record denies the existence of significant overlap in personnel, arguing that he did not participate in the "first conspiracy." Palmero testified, however, that prior to these first three marijuana transactions, Record provided him and another individual with names of others in order to "put together a smuggling network." Rec. vol. V at 323. One of these individuals was a pilot named Dick Pinder (Pinder). *Id.* at 324. Barbara Fore, a former girlfriend of Pinder, testified that around 1979 or 1980, Pinder told her that he was involved in the drug business with Record and Palmero, that he traveled often to Jamaica, and that Record, Palmero, and himself had lost a plane in Jamaica in the course of their drug dealings. *Id.* at 480–87. Finally, Palmero indicated that Record received and sold the marijuana imported in the second of these first three deals. *Id.* at 334–35.

The heart of the conspiracy charged in the indictment consists of the transactions that Record calls the "second conspiracy." From approximately mid-1982 until late 1983 or early 1984, the key players were all heavily involved. Olarte provided marijuana and cocaine in Colombia, *e.g.,* rec. vol. IV at 97, and Record provided transportation and security for the intermediate stop in the Bahamas, as well as transportation to Florida and distribution once there, *id.* at 55–56. Palmero and Jamieson assisted in offloading the drugs from planes in the Bahamas, and Jamieson transported the

tween two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendant as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that the defendant was a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant. In other words, to find the defendant guilty, you must find that the defendant was a member of the conspiracy charged in the indictment and not some other separate conspiracy.

drugs by boat from the Bahamas to Florida. *E.g.,* rec. vol. V at 347–50. Sometime during this period, Palmero began piloting the leg from Colombia to the Bahamas and began to take a more active organizational role. *Id.* at 362–367. At this juncture, evidence of a conspiracy involving these individuals is overwhelming.

Record argues that the "third conspiracy" was separate in that Record was excluded by Olarte due to the loss of 20–25 kilos of cocaine. However, the purpose and method of operation remained the same. Jamieson, Palmero, and Olarte continued to participate. And despite Record's insistence on his subsequent lack of participation, a "turnover," much less a change by one, in personnel does not terminate a conspiracy. *United States v. Brewer,* 630 F.2d 795, 800 (10th Cir.1980) (individual who participated in initial drug transaction remained part of single, continuing conspiracy even after being excluded from future dealings by coconspirators). "That 'some of the participants remained with the enterprise from its inception until it was brought to an end, and others joined or left the scheme as it went along,' is of no consequence if each knew he was part of a larger ongoing conspiracy." *Id.* (quoting *United States v. Parnell,* 581 F.2d 1374, 1382 (10th Cir.1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979)).

Finally, Record disagrees that the proof showed a common goal to import and distribute drugs for profit, as he claims that the purpose of the "fourth conspiracy" was to effect Olarte's escape from jail, not to make money from the importation and distribution of drugs as in the other transactions. Olarte testified, however, that in his discussions with Palmero regarding escape from the Tulsa county jail, he indicated that Palmero's help would be rewarded by drugs or drug deals so that Palmero could make some more money. Rec. vol. IV at 152. During this time, Olarte had phoned his wife Lacle, asking her to put Palmero in contact with someone who could help Palmero consummate the deal originally planned in Aruba by Palmero, Olarte, and Jamieson. Rec. vol. IV at 149. Palmero testified that after he had spoken by phone

to Olarte in Tulsa and after having sent Olarte the $4,000, he actually went to Aruba again and met with Lacle and Jamieson, among others, where they agreed to import cocaine to raise money for Olarte. Rec. vol. V at 392–94. From this, the jury could infer that the discussions between Palmero and Olarte were in furtherance of the conspiracy's original purpose to import and distribute drugs for profit, the only change being that the fruits would be used for Olarte's escape, rather than the boats and houses purchased by various participants with past drug proceeds.

We take note of Judge Friendly's opinion in *United States v. Borelli,* 336 F.2d 376 (2d Cir.1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), which, while not cited by Record, perhaps best supports his position. There, a defendant was convicted for joining in an ongoing conspiracy to import and distribute heroin from 1950 to 1959, although the defendant's participation was limited to two 1951 heroin purchases. The defendant argued that the illegal agreements involving him did not reach into the five-year statute of limitations period preceeding the 1962 indictment. The court agreed, rejecting as a "considerable oversimplification" the "view that if the evidence warrants the finding that some defendants were parties to a single agreement to sell contraband for a nine-year period, it necessarily does so as to every defendant who has conspired with them at any time for any purpose." *Id.* at 384. According to the court, the two 1951 purchases were insufficient to warrant an inference that the defendant agreed to participate in significantly changed operations begun seven years later. *Id.* at 385.

We agree with the statement in *Borelli* that "it is . . . essential to determine what kind of agreement or understanding existed as to each defendant." *Id.* at 384; *Dickey,* 736 F.2d at 583 (guilt individual and personal in conspiracy case). The facts of this case are distinguishable from *Borelli,* however, in that Record was a central conspirator rather than an isolated purchaser like the defendant in *Borelli.* The Second Circuit has held since *Borelli* that an indi-

vidual's understanding of an agreement may be inferred from the "nature of the criminal enterprise and the defendant's role in it, since 'it would be unrealistic to assume that major producers, importers, wholesalers or retailers [of narcotics] do not know that their actions are inextricably linked to a large on-going plan or conspiracy.'" *United States v. Taylor*, 562 F.2d 1345, 1352 (2d Cir.) (quoting *United States v. Arroyo*, 494 F.2d 1316, 1319 (2d Cir.), *cert. denied* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974)), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).[2]

Here, Record clearly was a primary player responsible for transportation to the United States of the drugs obtained in Columbia by Olarte, and for the security of the smuggling effort. Record introduced Palmero to Olarte, rec. vol. V at 353, and this introduction permitted transactions to proceed virtually unchanged after Record was excluded, as Palmero assumed the organizational and transportation roles previously filled by Record. *Id.* at 385; rec. vol. VII at 750. This contrasts with *Borelli* where the later transactions were described by the court as a different "chapter" or "phase," involving changed operations and an altered core of conspirators. *Borelli*, 336 F.2d at 381–86. Record recruited Jamieson for the drug importation scheme in 1983. Rec. vol. VII at 658. Jamieson continued to participate with Palmero and Olarte after Record was excluded, and Jamieson testified that his goal in participating in drug smuggling with Record "[w]as to do one deal, make some money, and do another one." *Id.* at 717–18. These circumstances are sufficient to allow a rational trier of fact to impute to Record an understanding of the ongoing nature of the illegal conspiracy. Thus, we hold that there was no variance as the jury could

have found beyond a reasonable doubt that the "four conspiracies" argued by Record were indeed a single conspiracy as alleged in the indictment.

■ That does not end our inquiry, however, because while Record, as a member of the single conspiracy charged in the indictment, is responsible for all overt acts committed in furtherance of that conspiracy, his connection to the conspiracy would terminate upon an effective withdrawal. *See United States v. Troutman*, 814 F.2d 1428, 1448 (10th Cir.1987). Record asserts that even assuming the proof reflected a single conspiracy, he did not participate in the conspiracy charged in the indictment after being excluded by Olarte from the 1985 390–kilo cocaine deal. Jamieson also testified that Record had indicated at about the same time that "he wanted to cool it for a while, that things were hot, he felt like things were hot." Rec. vol. VII at 702.

A defendant bears the burden of establishing withdrawal from a conspiracy. *United States v. Parnell*, 581 F.2d 1374, 1384 (10th Cir.1978), *cert. denied*, 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979). To withdraw, an individual must act affirmatively by "either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach co-conspirators." *Id.* While Record asserts that he did not participate in the activities of the conspiracy after the 1983 deal involving 290 kilos of cocaine and 400 pounds of marijuana, "mere cessation of activities alone is not enough" to constitute withdrawal. *Id.*

Neither was Record's comment to Jamieson that he wanted to "cool it" for a while the type of affirmative act needed to support a withdrawal. Jamieson testified that Record said "after things cooled off he

2. While the court in *Borelli* applied its reasoning regarding the isolated purchaser to other defendants, including one described as a "central" participant, *Borelli*, 336 F.2d at 386, we decline to accord this significant weight for two reasons. First, after the court discussed in detail why a peripheral conspirator's limited participation did not give rise to an inference that he made himself a part of whatever the core conspirators later did, it is difficult to understand why the court applied such reasoning, without discussion, to a central conspirator. More importantly, the Second Circuit has clearly indicated since *Borelli* that "centrality" does make a difference, as it held in *Taylor* that the extent of a conspirator's agreement regarding the ongoing nature of a conspiracy may be inferred in part from that conspirator's role in the criminal enterprise. *Taylor*, 562 F.2d at 1352.

would start doing something again at a later time or whatever." Rec. vol. VII at 702. That Record was cut out of subsequent drug deals by coconspirators is not dispositive of his criminal liability. *See Brewer,* 630 F.2d at 800 (no withdrawal when participant in initial drug transaction cut out of subsequent dealings part of same conspiracy). Record has not met his burden with regard to withdrawal and is therefore responsible for all acts done in furtherance of the single conspiracy charged in the indictment, including those touching the Northern District of Oklahoma. Thus, we hold that venue there was proper. *See United States v. Behrens,* 689 F.2d 154, 161 n. 1 (10th Cir.), *cert. denied,* 459 U.S. 1088, 103 S.Ct. 573, 74 L.Ed.2d 934 (1982); *United States v. Petersen,* 611 F.2d 1313, 1333 (10th Cir.1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 2986, 64 L.Ed.2d 854 (1980).

## II.

 Record next argues, without citation to authority, that the trial court erred by instructing the jury that "using a telephone" could constitute an overt act in furtherance of a conspiracy, thereby unduly emphasizing to the jury telephone conversations between Palmero and Olarte, the government's main evidence used to establish venue in the Northern District of Oklahoma. The trial court instructed the jury that an overt act "may be as innocent as the act of a man walking across the street, or driving an automobile, or using a telephone." Rec. vol. I, doc. 121. This wording is identical to that found in the pattern instruction in the standard reference on jury instructions. *See 2 Devitt & Blackmar, Federal Jury Practice & Instructions* § 27.07 (3d ed. 1977). As counsel for Record failed to object at trial to this instruction, we review for plain error. *United States v. Newman,* 733 F.2d 1395, 1402 (10th Cir.1984); *see* Fed.R.Crim.P. 30.

To analyze this claim, we must first put the consideration of venue in this case into perspective. While venue is a part of the prosecution's case which must be proved by a preponderance of the evidence, *Rinke,*

778 F.2d at 584, counsel for Record agreed with the trial court and the government that venue was an issue for the trial court to decide. Rec. vol. VII at 636–38. Record neither requested a jury instruction on venue nor objected to the lack of one. Instead, counsel for Record attacked venue through the multiple conspiracy defense, arguing that the overt acts touching the Northern District of Oklahoma were part of a separate conspiracy not involving Record. *See* rec. vol. VII at 824–25 (motion for judgment of acquittal); *id.* at 843–45 (discussions with the trial court regarding jury instructions). The trial court instructed the jury regarding multiple conspiracies in the fashion requested by Record.

The evidence at trial of the phone calls in question was uncontradicted, and counsel for Record even acknowledged to the trial court that *some* conspiracy touched the Northern District of Oklahoma, *id.* at 825–26. Thus framed by the parties and the trial court, therefore, the jury's task with respect to venue was the indirect one of considering whether the proof reflected the single, ongoing conspiracy charged in the indictment, thus connecting Record with the acts establishing venue in the Northern District of Oklahoma. Given this context, we find no error, and certainly not plain error, in the giving of the overt acts instruction as worded. *See United States v. Pringle,* 576 F.2d 1114, 1120 (5th Cir.1978) (no prejudice, considering jury charge as a whole, when two examples in pattern overt acts jury instruction paralleled aspects of government's case).

 Nevertheless, we consider the failure of the trial court to submit the venue issue specifically to the jury, as we have held that it is "fundamental error" to fail to instruct the jury as to the necessary elements of the offense charged. *United States v. King,* 521 F.2d 61, 63 (10th Cir. 1975), *overruled on other grounds, United States v. Savaiano,* 843 F.2d 1280 (10th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988). Other courts have developed rules examining the particular circumstances of a case rather than requiring automatic reversal for the failure

to instruct the jury on venue. *See, e.g.,*
*United States v. Moeckly,* 769 F.2d 453,
462 (8th Cir.1985) (denial of venue jury
instruction harmless error when evidence
establishing venue is uncontroverted and
substantial), *cert. denied,* 476 U.S. 1104,
106 S.Ct. 1947, 90 L.Ed.2d 357 (1986);
*United States v. Winship,* 724 F.2d 1116,
1124–25 (5th Cir.1984) (failure to instruct
on venue is reversible error when venue
put into issue and defendant requests in-
struction). The instant case, however, does
not involve either oversight by the trial
court or its denial of a proper request to
charge the jury regarding venue, as the
parties agreed that the issue was within
the province of the trial court. We find no
error when the parties themselves submit
the issue to the trial court and the tran-
script supports the determination by the
trial court that venue was established.

### III.

■ Record next contends, again with-
out citation to authority, that the trial court
erred by advising the prosecution before it
had rested that it had not adequately
proved venue. Record does not argue here
that venue was improper, and we already
have held to the contrary. Instead, Record
argues that the comments of the trial court
"let the prosecution know they needed to
present additional evidence," thereby vio-
lating his rights to due process and the
effective assistance of counsel, guaranteed
by the fifth and sixth amendments respec-
tively.

The statements complained of occurred
following the testimony of Harry Bennett,
a pilot who had picked up drugs from
Olarte in Colombia and flown them to
Record in the Bahamas. Bennett testified
that he traveled to Oklahoma in July 1983
to purchase the plane he used to fly the
drugs, and that he may have flown over
the Northern District of Oklahoma on the
return flight to Florida. After this testi-
mony, the trial court made the following
statement:

> While we're waiting for that witness, I
> just wanted to make the point to counsel
> outside the hearing of the jury that in

view of the very equivocal testimony of
this witness, Bennett, on whether or not
from Santa Fe, New Mexico on the way
to the vicinity of Memphis on the June,
1983 trip in the 421 Cessna where he was
traveling with the pilot Bullock, the
Court does not think that adequate for
purposes of establishing venue in the
Northern District of Oklahoma because
he in effect said, "I assume we crossed
the Creek County area," and then on
cross-examination says it's equally possi-
ble they didn't.

> So I just wanted to alert counsel and
> counsel for the government to the effect
> that I consider that will cause a problem
> area if that is going to be the basis for
> establishing venue here in the Northern
> District of Oklahoma.... I just wanted
> to alert counsel as to this witness while
> we were on that subject to point out that
> problem area.

Rec. vol. V at 313.

We need express no opinion on whether
the statements complained of were error as
we find from a review of the transcript
that any error was harmless. At the time
of the trial court's statement, the prosecu-
tion had already introduced testimony suf-
ficient to establish venue in the Northern
District of Oklahoma by a preponderance
of the evidence. Olarte had previously tes-
tified that he made phone calls from his jail
cell in Tulsa directing his wife and Palmero
to further the deal planned in Aruba, which
the jury found to be part of the single,
ongoing conspiracy. The trial court even
acknowledged during its statement that
Bennett's testimony was not the govern-
ment's sole basis for establishing venue,
but that "it would be something perhaps in
the nature of cumulative testimony along
that line." Rec. vol. V at 313. The trial
court's statement was thus harmless be-
yond a reasonable doubt.

### IV.

■ Record contends that the jury was
prejudicially confused by the failure of the
trial court to define the term "broader con-
spiracy" in its instructions. The trial court
instructed the jury as follows:

If you find that the defendant was involved merely in a single transaction, that conduct may be treated as permitting the inference of knowledge of a broader conspiracy if the single act itself shows so much familiarity with or high-level participation in the overall conspiracy as to be in and of itself indicative of the broader conspiracy.

Rec. vol. I, doc. 121. As Record neither objected to the submission of this instruction to the jury, nor requested a clarification of the term in question, we review the instruction for plain error. *United States v. Newman,* 733 F.2d 1395, 1402 (10th Cir. 1984); *see* Fed.R.Crim.P. 30.

Record argues that use of the term "broader conspiracy" gave undue emphasis to the government's position that the proof reflected the single conspiracy charged in the indictment. The trial court instructed the jury at length, however, regarding the significance of possible proof of multiple conspiracies differing from the single conspiracy for which Record was indicted. A portion of the instructions stated specifically that "if you find that no such [single] conspiracy existed, then you must acquit the defendant." Rec. vol. I, doc. 121. Given this context, and considering the plain meaning of "broader conspiracy," we find no error, let alone plain error. Record's contention that the term shifted the burden of proof to the defendant and denied him his sixth amendment right to be informed of the nature and cause of the accusation against him flirts with the frivolous.

**3.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**4.** Rule 801(d)(2)(A) states that "[a] statement is not hearsay if [t]he statement is offered against a party and is the party's own statement in either an individual or a representative capacity."

**5.** Rule 404(b) only applies to evidence of acts extrinsic to the charged crime. *United States v.*

## V.

█ Record claims that the trial court erred by admitting testimony regarding the importation of marijuana by Record prior to the time period of the conspiracy charged in the indictment. Jamieson testified that during the period of the charged conspiracy, he and Record had discussions wherein Record sought Jamieson's participation in "the drug business." Rec. vol. VII at 658. Jamieson testified that during these discussions, Record told of his prior experience in smuggling, namely a 1978 transaction where Record had brought 32,-000 pounds of marijuana into Louisiana on a shrimp trawler. *Id.* at 660.

Prior to introduction of the testimony, defense counsel made a motion in limine seeking to prevent the admission of Record's statement. While defense counsel initially objected to the statement as inadmissible hearsay, the trial court properly focused on the Rule 404(b)[3] implications of the testimony, which focus defense counsel then adopted. Rec. vol. VII at 646. The prosecution emphasized that the testimony was admissible contrary to the hearsay objection, but failed to recognize the Rule 404(b) aspect of the testimony, stating that "[t]hat evidence is not being offered by the government for any 404(b) purpose." *Id.* at 647. The trial court then responded to both the hearsay and Rule 404(b) contentions, ruling that the testimony was admissible as a nonhearsay statement under Fed.R.Evid. 801(d)(2)(A)[4] *and* as tending to prove "motive, opportunity, intent, preparation, plan, [or] knowledge."[5] *Id.*

*Orr,* 864 F.2d 1505, 1510 (10th Cir.1988). An uncharged act may not be extrinsic if it was part of the scheme for which a defendant is being prosecuted, *see Orr,* 864 F.2d at 1510, or if it was "inextricably intertwined" with the charged crime such that a witness' testimony "would have been confusing and incomplete without mention of the prior act." *United States v. Richardson,* 764 F.2d 1514, 1521–22 (11th Cir.), *cert. denied,* 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985). Record's statement to Jamieson, although during the time of the charged conspiracy, fits into neither of these categories, so we will analyze its admission under Rule 404(b) as involving an extrinsic act.

Jamieson then testified, and the prosecution sought to introduce through Jamieson Record's statement regarding his prior misconduct. Defense counsel again objected, and pursuant to an earlier request, the trial court gave the jury a limiting instruction regarding the Rule 404(b) purposes of the testimony. *Id.* at 660–61. Defense counsel did not object to the limiting instruction or request that one be given during the general charge to the jury. The jury was not given a separate instruction at the close of the case. We review the trial court's decision to allow this testimony for an abuse of discretion. *United States v. Neal,* 718 F.2d 1505, 1509–10 (10th Cir.1983), *cert. denied,* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984).

Our analysis of this issue requires us to briefly summarize the development of Rule 404(b) law in this circuit. In *United States v. Nolan,* 551 F.2d 266 (10th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977), we described the parameters of Rule 404(b) admission in an inclusive sense, holding that "it would allow admission of uncharged illegal acts unless the only purpose for their admission is to prove the criminal disposition of the defendant." *Id.* at 271. Nevertheless, we have developed numerous requirements which must be met before 404(b) acts may be admitted. *United States v. Cuch,* 842 F.2d 1173, 1176 (10th Cir.1988). In fact, when faced with the admission of Rule 404(b) evidence, a trial court in this circuit is burdened with considering at least ten separate factors before ruling on the admissibility of the proffered evidence.

*Nolan* itself articulated five guidelines to be used in determining the admissibility of uncharged illegal acts. There we said that (1) the evidence must tend to establish intent, knowledge, motive, identity, or absence of mistake or accident; 2) the evidence must be so related to the importation of contraband that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident;

(3) the evidence must have real probative value, not just possible worth; (4) and the uncharged illegal act must be close in time to the crime charged.

*Nolan,* 551 F.2d at 271 (citation omitted). We further held that "[t]he probative value of proof of the commission of the prior crime must outweigh the prejudice."[6] *Id.*

We have held that the government bears the burden of showing the proffered evidence to be relevant to an issue in the case, and that the government "must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the evidence of other acts." *United States v. Kendall,* 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986). We have also required the trial court to "specifically identify the purpose for which such evidence is offered," further noting that "a broad statement merely invoking or restating Rule 404(b) will not suffice." *Id.* Further, we have held that there must be a clear and logical connection between the uncharged misconduct and the case being tried. *United States v. Biswell,* 700 F.2d 1310, 1317–18 (10th Cir.1983).

Our recent pronouncement on Rule 404(b) in *United States v. Rivera,* 837 F.2d 906 (10th Cir.), *reh'g granted on other grounds,* 847 F.2d 660 (10th Cir.1988), shows a perspective toward Rule 404(b) much transformed since the inclusive approach reflected by *Nolan.* In *Rivera,* we stated that " '[t]he use of other crimes evidence is not looked on favorably and its use must be narrowly circumscribed and limited.' " *Id.* at 911 (quoting *United States v. Lewis,* 787 F.2d 1318, 1321 (9th Cir.1986)). In furtherance of this restrictive approach, we added to the growing list of requirements, holding that

[i]f evidence is admitted solely under the authority of Rule 404(b), the court must give a limiting instruction both at the time the evidence is admitted and in the general charge to minimize the danger

---

**6.** "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consid-

erations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R.Evid. 403.

that the jury might use the evidence as proof that the defendant acted in conformity with his past acts on the occasion for which he is being tried.

*Id.* at 913.

We must now reevaluate the proper application of Rule 404(b) in light of the Supreme Court's recent pronouncement in *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). In *Huddleston,* the defendant had been convicted of possessing and selling stolen goods, 32,000 blank video cassette tapes, in interstate commerce. The defendant did not dispute that the tapes were stolen, but only that he was unaware of that stolen character. The trial court admitted evidence of "similar acts" pursuant to Rule 404(b) as tending to show the defendant's knowledge that the tapes were indeed stolen. Specifically, evidence was admitted that the defendant had sold a number of 12" black-and-white televisions for $28 each. While the defendant did not question the relevance of the proffered testimony, he asserted that the government failed to prove to the trial court by a preponderance of the evidence, prior to admission of the testimony, that the televisions were in fact stolen. *Id.* 108 S.Ct. at 1497–99.

Writing for a unanimous Court, Justice Rehnquist stated that requiring the trial court to make such a preliminary finding "is inconsistent with the structure of the Rules of Evidence and with the plain language of Rule 404(b)." *Id.* at 1500. Briefly sketching that structure, the Court noted that Rules 401 and 402 establish the basic principle that relevant evidence is admissible unless the Rules provide otherwise, while Rule 403 allows the trial court to exclude evidence when its probative value is substantially outweighed by potential prejudice. Rules 404–412 address problematic evidentiary matters, but seek only to limit the uses rather than to prohibit the introduction of such evidence. *Id.*

The Court also examined the legislative history of Rule 404(b), concluding that "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." *Id.* at 1500–1501. Given this context, the Court stated that the defendant's reading of Rule 404(b) "as mandating a preliminary finding by the trial court that the act in question occurred not only superimposes a level of judicial oversight that is nowhere apparent from the language of that provision, but it is simply inconsistent with the legislative history behind Rule 404(b)." *Id.* at 1500.

The Court was not unconcerned that unduly prejudicial evidence might be admitted under Rule 404(b). According to the Court, however,

the protection against such unfair prejudice emanates not from a requirement of a preliminary finding by the trial court, but rather from four other sources: first, from the requirement of Rule 404(b) that the evidence be offered for a proper purpose; second, from the relevancy requirement of Rule 402—as enforced through Rule 104(b); third, from the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice; and fourth, from Federal Rule of Evidence 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Id.* at 1502 (footnote and citations omitted).

As an inferior federal court, we are necessarily guided by *Huddleston* in reviewing a trial court's decision to admit evidence under Rule 404(b). Generally, we note that the inclusive approach toward the admission of 404(b) evidence reflected in the *Nolan* decision is vindicated by the Court's comment that Congress was more concerned with avoiding restrictions on the admission of 404(b) evidence than with potential prejudice. *Id.* 108 S.Ct. at 1501; *Cuch,* 842 F.2d at 1176. Further, *Huddleston* provides a four-step framework for avoiding such prejudice, which will greatly simplify the task of a trial court in this circuit, as well as a reviewing court, in

analyzing the admission of Rule 404(b) evidence. Thus, mindful of *Huddleston*'s inclusive approach, we will apply to the facts of this case the requirements articulated therein by the Supreme Court.[7]

The trial court's decision to admit in the instant case satisfies the first two requirements of *Huddleston,* as we hold that the testimony regarding the prior marijuana transaction was both offered for and relevant to a proper purpose. We have previously recognized the probative value of uncharged acts evidence to demonstrate motive, intent, knowledge, or plan in the context of a conspiracy prosecution. *E.g., Orr,* 864 F.2d at 1511; *United States v. Mora,* 845 F.2d 233, 237 (10th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 562, 102 L.Ed.2d 587 (1988); *United States v. Brown,* 770 F.2d 912, 914 (10th Cir.1985), *rev'd on other grounds,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987); *United States v. Bridwell,* 583 F.2d 1135, 1140 (10th Cir.1978), *United States v. Parnell,* 581 F.2d 1374, 1384 (10th Cir.1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979). In *Brown,* where the defendant was charged with conspiracy to possess with intent to distribute marijuana and cocaine, we allowed under Rule 404(b) evidence of defendant's prior arrest for possession of marijuana, stating that "[t]he prior act at issue here was highly probative of defendant's scheme to possess and distribute marijuana. The Tenth Circuit has long recognized the relevance of previous wrongs and crimes in the context of narcotics violations." *Id.* at 914. Such is especially true where, as in the case of Record, the uncharged misconduct is close in time and similar in method to the charged scheme. *Bridwell,* 583 F.2d at 1140.

Our conclusion that the testimony was offered for a proper and relevant purpose is bolstered by comparison to *United States v. Barbieri,* 614 F.2d 715 (10th Cir. 1980), where the defendant was tried on a charge that he conspired to organize a prostitution business in violation of the Travel Act, 18 U.S.C. § 1952. Testimony was admitted at trial showing that during discussions for this purpose, the defendant encouraged others by stating that he would set up an operation "just like we had in St. Louis." *Id.* at 717. Similarly, during the time of the charged conspiracy, Record sought to encourage Jamieson by boasting of a prior successful drug importation. We held in *Barbieri* that reference to this prior, uncharged act was relevant to show intent and plan and to show "the dimensions and continuing nature of [defendant's] scheme." *Id.* at 719. This holding applies to the instant situation where Record's primary defense at trial consisted of denying the continuing nature of the charged conspiracy.

*Huddleston* next requires that the trial court weigh under Rule 403 the probative value of the similar acts evidence against its potential for unfair prejudice. *Huddleston,* 108 S.Ct. at 1502. The trial court has broad discretion to determine whether or not prejudice inherent in otherwise relevant evidence outweighs its probative value. *United States v. Esch,* 832 F.2d 531, 535 (10th Cir.), *cert. denied,* — U.S. —, —, 108 S.Ct. 1084, 1299, 99 L.Ed.2d 242, 509 (1988). The trial court did not abuse that discretion here where the evidence was highly probative of the charged scheme, the use of the evidence was very limited in the context of the whole trial,

7. Of course, this does not mean, and we could not hold that our prior decisions consistent with *Huddleston* no longer have precedential value. For instance, the *Kendall* requirements that the government and trial court articulate precisely the basis for which evidence is offered and admitted is consistent with *Huddleston*'s first two requirements that Rule 404(b) evidence be offered for and relevant to a proper purpose, and the *Kendall* requirements facilitate the third *Huddleston* requirement that the trial court weigh probative value against potential prejudice. In the instant case, the government and trial court failed to articulate precisely a basis for admission as required by *Kendall.* Since *Huddleston,* however, we have held that any error in failing to adhere to the *Kendall* requirements would be considered harmless if "the purpose for admitting the other acts testimony is apparent from the record, and the district court's decision to admit was correct." *United States v. Orr,* 864 F.2d 1505, 1511 (10th Cir. 1988). Thus, if the transcript reflects that the "decision to admit" was proper under the requirements of *Huddleston,* any failure to adhere to *Kendall* will necessarily be harmless.

and introduction of the evidence was followed by the trial court's limiting instruction to the jury.

Finally, we must examine the trial court's failure to "give a limiting instruction both at the time the evidence is admitted and in the general charge" as required by *Rivera*, which was decided without the benefit of the recent *Huddleston* decision. *Rivera*, 837 F.2d at 913. A limiting instruction was given, as requested, at the time of the admission of the testimony, but such an instruction was neither requested nor given at the close of the case. The Court stated in *Huddleston* that a trial court may protect against potential prejudice in the admission of Rule 404(b) evidence by, among other things, giving the jury a limiting instruction *"upon request"* as provided for by Fed.R.Evid. 105. *Huddleston*, 108 S.Ct. at 1502 (emphasis added). While we certainly recognize the salutary purpose and effect of such instructions, in the wake of *Huddleston* it is not error for a trial court to fail to instruct the jury at the close of the case in the absence of a proper request by counsel. *See Cuch*, 842 F.2d at 1177; *Bridwell*, 583 F.2d at 1140. Thus, considering the *Huddleston* guidelines, we hold that the trial court acted within its discretion under Rule 404(b) in admitting testimony regarding the prior marijuana importation.

## VI.

■ Lastly, Record argues that he was unfairly prejudiced by the prosecution's closing argument when counsel for the government, in concluding a fishing metaphor, said to the jury: "You've got him in the boat. What are you going to do? Are you going to throw him back into the sea of narcotics to grow up and be a world record bass?" Rec. vol. VIII at 993. In analyzing a claim of prosecutorial misconduct, we usually determine first whether the alleged misconduct was in fact error, and if so, whether such error requires reversal or instead whether it was harmless beyond a reasonable doubt. *United States v. Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988). We need not examine in depth the

existence of error, however, if we are convinced that the asserted error, whether or not actually error, was harmless beyond a reasonable doubt. *Id.* In evaluating prosecutorial misconduct under the harmless error doctrine, "we must look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." *Id.*

Here, the trial court did not caution the jury regarding the prosecutor's comment at that time because counsel for Record did not object to the comment until after the prosecutor's argument and after the trial court had discussed the future course of the trial with the jury (filling two pages of transcript) and dismissed them for lunch. Thus, the conduct of counsel for Record limited the trial court's ability to caution the jury regarding any possible error. However, immediately prior to the statement objected to, Record's counsel objected to "improper argument," and the trial court overruled the objection stating: "Remember ladies and gentlemen, you folks heard the evidence." Rec. vol. VIII at 993. Further, prior to their deliberation, the trial court instructed the jury that "the statements and arguments of counsel are not evidence in the case." Rec. vol. I, doc. 121.

The prosecutor's comment was brief and repeated nowhere else in the trial. Significantly, the reference to possible future narcotics violations was indirect and non-threatening to the jury, reducing the propensity of the comment to affect the jurors' decision. In that sense, the statement differs considerably from that found in the case cited by Record, where the prosecutor said: "Ladies and gentlemen, if he walks out of this courtroom, this is a blank check, this is a blank check for this man to go out and commit a crime against you, against Judge O'Kelley, against your families, against your friends...." *See United States v. Williams*, 523 F.2d 1203, 1208 (5th Cir.1975). Finally, the evidence of guilt was not so scant as to render this comment pivotal to the jury's decision. Given the trial court's instruction, the limited and indirect nature of the comment, and ample evidence of guilt, we are convinced that the prosecutor's comment was harm-

less beyond a reasonable doubt. *See Martinez–Nava,* 838 F.2d at 416–17.

AFFIRMED.