930 F.2d 36
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bishop Robert ST. CLAIR, Defendant-Appellant.
 No. 89-1383.
 United States Court of Appeals, Tenth Circuit.
 March 19, 1991.
 
 1
 Before McKAY and STEPHEN H. ANDERSON, Circuit Judges, and CHRISTENSEN*, District Judge.
 
 
 2
 ORDER AND JUDGMENT**
 
 
 3
 A. SHERMAN CHRISTENSEN, District Judge.
 
 
 4
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist a determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 5
 This is an appeal[1] from a judgment of conviction and prison sentence on a seven-count indictment and jury verdict for conspiracy, wire fraud and the interstate transportation of stolen property. Tried separately from his alleged co-conspirator, appellant contends the trial court erred in receiving evidence concerning improper conduct of persons not part of the conspiracy charged, activities and declarations of his alleged co-conspirator, and records of the latter, and evidence of St. Clair's "fraudulent life style," and that he was denied effective assistance of counsel.[2] We affirm for reasons hereinafter stated.
 
 
 6
 Apart from the evidence challenged here, there is testimony in the record tending to show that, with the participation of the appellant Bishop Robert St. Clair and one Alexander Dorsey, investors interested in financing the sale of Wyoming coal leases for huge profits were fraudulently induced to advance more than $700,000 as "seed money" to obtain financial backing from shell or nonexistent offshore banks.[3]
 
 
 7
 Appellant first argues that the trial court erred in receiving evidence of improper acts by persons who were not part of the conspiracy charged. Because no objection was made to any such evidence, we review its receipt for plain error. United States v. Jefferson, 1991 WL 7657 (10th Cir. (Wyo.) 1991). Background briefly can be described in the words of appellant's brief:
 
 
 8
 The alleged conspiracy began when a group of persons trying to sell a coal lease in Wyoming contacted St. Clair, who in turn contacted Dorsey (Tr. 191, 194, 673). Agreements were reached whereby Dorsey, and later St. Clair, agreed to buy the coal lease (Tr. 191-192, 260). Each agreement was conditioned on the coal group raising sufficient funds to make offshore banks (Anguilla) owned by Dorsey and St. Clair operational (Tr. 92-96, 261). Those banks would then be able to obtain funds to consummate the purchase of the coal lease.
 
 
 9
 The fund raising was exclusively the responsibility of the coal group, which secured investments of $200,000.00 and $125,000.00 from Robert Whittlesey, $35,000.00 from Dr. Pat Pugh, plus other investments (Tr. 105, 121, 146, 242, 262, 481 and 490).
 
 
 10
 .............................................................
 
 
 11
 ...................
 
 
 12
 * * *
 
 
 13
 To obtain these investments, two members of the coal group, Ralph Hall and Clarence Blair, pledged property they owned as security for the above described investments from Whittlesey and Pugh (Tr. 98, 122, 162, 164, 482-483).
 
 
 14
 Appellant's brief at 8-9.
 
 
 15
 St. Clair maintains that "[b]oth Hall and Blair misrepresented and falsified the value of their properties, and/or the outstanding encumbrances." Id. at 9. His point seems to be that he was somehow prejudiced by evidence of the wrongful acts of others not a part of the conspiracy.
 
 
 16
 The evidence leaves no room for doubt that whatever collateral efforts were made to raise money were based upon and the result of the St. Clair-Dorsey conspiracy of which the investors then had no knowledge, were never otherwise ascribed to defendant and under the instructions of the court could not have been understood by the jury as misconduct on the part of St. Clair. Besides, not only did appellant's counsel fail to object to this testimony, but it came into the record only incidentally during the government's case and was emphasized on cross-examination in apparent effort to divert attention from appellant's own wrongdoing. We see neither plain error nor prejudice to the defendant here.
 
 
 17
 The appellant next contends that the trial court erred in permitting the witness Lukich to testify about activities and declarations of alleged co-conspirator Dorsey and in admitting exhibits that violated the hearsay rule. Lukich let Dorsey in January or February 1983, and continuing to the fall of that year, use one of his offices. When Dorsey moved out, he left numerous papers including canceled checks, check stubs, bank statements and wire transfers, as well as documents about one of the banks for which the conspirators purportedly were raising "seed money." Many of these were introduced in evidence by the government, as were certain statements made by Dorsey to Lukich concerning his dealings with St. Clair.
 
 
 18
 Appellant particularly complains of testimony from Lukich that Dorsey borrowed part of the name of Lukich's M.G.S. Oil and Petroleum Corporation to describe "MGS" bank shares of one of the banks utilized in the conspirators' appeal to investors, that Dorsey had a Telex installed by which he sent messages to banks all over the world, that Dorsey talked "about St. Clair, that St. Clair would call Dorsey, and that Dorsey sent money to St. Clair," and that Lukich thought Dorsey was working a "scam." Appellant's brief at 15. Most of this testimony was so patently relevant and within the period and scope of the otherwise established conspiracy as to leave little question of its admissibility. The conclusion of the witness about "scams" was not only relatively innocuous in relation to the overwhelming evidence to this effect but was elicited quite inadvertently by the government.[4]
 
 
 19
 The order of proof and admission procedures were circumspect on the part of the court.[5] There was ample independent evidence of the conspiracy between St. Clair and Dorsey even though this were deemed essential. But see U.S. v. Peveto, 881 F.2d 844, 852 (10th Cir.), cert. denied sub nom, 110 S.Ct. 348 (1989); U.S. v. Hernandez, 829 F.2d 988, 992-94 (10th Cir.1987), cert. denied, 485 U.S. 1013 (1988). Dorsey's declarations involving St. Clair tended to explain the methods of the charged conspiracy and especially the division of generated funds. The check stub notations indicating that cash withdrawals were intended for St. Clair were connected up and explained by testimony from Lukich about his participation in the transmissions to St. Clair via Western Union.[6]
 
 
 20
 St. Clair asserts that the earliest evidence of any conspiracy between Dorsey and him was in March or April 1983, and that acts and declarations of Dorsey before that date should not have been received. He also complains about the hearsay nature of the papers left by Dorsey as denying him the right of confrontation.
 
 
 21
 The indictment charged that the conspiracy between St. Clair and Dorsey began on or before January 1, 1983. There is evidence in the record that appellant's relationship with Dorsey concerning offshore banking originated prior to that date, and there is circumstantial evidence in the record tending to show that there was an ongoing conspiracy between St. Clair and Dorsey shortly afterwards.
 
 
 22
 No objection was made by defense counsel to the admission of the now questioned evidence and in at least one instance, to avoid the necessity of the government's bringing a custodian from out of the state, the foundation for bank records was expressly stipulated. The waiver of formal objection to evidence for which adequate foundation likely can be established is as often the hallmark of principled, as of ineffective, advocacy. And there may or may not have been tactical reasons to avoid wholesale objections not essential to one's theory of defense or considered abrasive to a jury. This often is difficult to tell on appeal without a specially developed record from the district court on these and related points.
 
 
 23
 In any event, a review of the record before us is persuasive that had the government been required to do so, much of the now questioned evidence could have been foundationally validated beyond question, was temporally as well as substantially relevant, that some was merely cumulative, part was admissible without further inquiry, some was plainly non-prejudicial even though inadmissible upon proper objection, reliability of none had been thrown into substantial question by surrounding circumstances, and the admission of no part is shown to have constituted plain error.
 
 
 24
 In support of his argument that the court erred in allowing evidence of his "fraudulent life style," St. Clair cites testimony of an FBI agent who testified from his interview and investigation that St. Clair did not have a social security number, that his current California driver's license reported only a P.O. box in California as an address while he maintained two residences in Arizona, that he had paid no income taxes since 1963, and that he was not a bishop as his name and representations implied. Failure to pay income taxes was the only part of this evidence to which there was objection.
 
 
 25
 As to the latter, we apply an abuse of discretion standard of review. United States v. Record, 873 F.2d 1363, 1375 (10th Cir.1989). The district court did not abuse its discretion in receiving over objection the income tax evidence.[7] Nor do we find plain error in relation to the other life style evidence. All was relevant to the issues of the case and its value outweighed any possible prejudicial effect. See Huddleston v. United States, 485 U.S. 681 (1988); United States v. Bedonie, 913 F.2d 782, 801 (10th Cir.1990); U.S. v. Pettit, 903 F.2d 1336, 1338 (10th Cir.), cert. denied, 111 S.Ct. 197 (1990); U.S. v. Suntar Roofing, Inc., 897 F.2d 469-479 (10th Cir.1990); United States v. Record, 873 F.2d at 1375; United States v. Bolt, 776 F.2d 1463, 1470-71 (10th Cir.1985); United States v. Pommerening, 500 F.2d 92, 100-01 (10th Cir.), cert. denied, 419 U.S. 1088 (1974).
 
 
 26
 The gist of the charges against St. Clair was that he participated in a conspiracy and schemes to defraud various persons and to obtain money by means of false and fraudulent pretenses of access to large sums of money for investors if they entrusted preliminary funds to him. It was the government's theory, supported by substantial evidence, that in carrying out his fraudulent schemes St. Clair held himself out to prospective victims as being a prominent bishop in a large protestant denomination, as well as a reputable, wealthy and successful businessman with impressive financial capabilities.[8]
 
 
 27
 The evidence tended to show that in fact he was not a bishop, did not pastor a church, took the position for the purposes of trial that he had no reportable income and was by other indications not a responsible or substantial businessman, the contrasts bearing directly upon his fraudulent schemes and the modus operandi by which he sought to consummate them.
 
 
 28
 Finally, we address the ineffective assistance of counsel assignment pressed with vigor in appellant's original brief.
 
 
 29
 A lawyer other than trial counsel represented appellant for the purposes of this appeal. Following submission of briefs, appellant's personal affidavit was tendered, elaborating that his trial counsel had been "blatantly ineffective," accompanied by a formal motion for consideration of the affidavit on this appeal. We took the motion under advisement pending the scheduled oral argument. Five days before the time set, appellant filed a letter informing us that his counsel on appeal no longer represented him, stating that thereafter he would be representing himself pro se, critically commenting on his appeal counsel's "trying to introduce that ineffective assistance of trial counsel [issue] before it was reviewed by the [district] Court of Record," and suggesting that under the circumstances his appeal should be dismissed. We granted requested leave for appeal counsel's withdrawal and for appellant to file a supplemental brief pro se, and ordered that the appeal be submitted on the briefs as before stated.
 
 
 30
 The appellant has now submitted his supplemental brief, incorporating word for word the text of the principal brief filed by his counsel, except for its section devoted to the ineffective assistance of counsel issue for which he substituted the text of his former appeal counsel's reply brief.
 
 
 31
 We now deny the pending motion for leave to file appellant's tendered affidavit, reject his suggestion that this appeal be dismissed, and refrain from ruling on the ineffective assistance of counsel issue. Beyond our rulings on the other issues presented to us on this appeal, our consideration of the latter issue is without prejudice, and we express no view concerning its merits should it be properly presented to the district court. See Oscar Diaz-Albertini v. United States, 111 S.Ct. 776 (1991).
 
 
 32
 The judgment of conviction is AFFIRMED.
 
 
 
 *
 Honorable A. Sherman Christensen, Senior Judge, United States District Court for the District of Utah, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The case has been before us once before on the question of bail pending appeal. United States of America v. Bishop Robert St. Clair, No. 90-1196 (10th Cir. Sept. 20, 1990) (unpublished)
 
 
 [2]
 Following submission, the latter contention was withdrawn as later explained
 
 
 [3]
 The appellant has not questioned the sufficiency of the evidence to support the verdict; nonetheless, as context for ruling on evidentiary questions, we take other evidence with reasonable inferences to be drawn therefrom in the light most favorable to the government. See United States v. Hooks, 780 F.2d 1526, 1532 and 1536 (Baldock specially concurring) (10th Cir.), cert. denied, 475 U.S. 1128 (1986); United States v. Popejoy, 578 F.2d 1346 (10th Cir.), cert. denied, 439 U.S. 896 (1978)
 
 
 [4]
 Q. What do you do with a Telex
 A. Well, he'd send Telexes to all--you know--all over the world I suppose to banks and I don't know who all. You know, you know, setting up these--I call them scams now, now that I look back at it, you know.
 Q. Don't use that terminology too much.
 A. How is that?
 Q. Don't use that terminology.
 A. Okay. I wouldn't know, though, you know. I just.
 Tr.Vol. VII at 299.
 
 
 [5]
 Prior to trial the court held a "James Hearing" to consider the admissibility of co-conspirator declarations at the close of which it ruled: "The evidence appears at this point to be overwhelming that there was a conspiracy; and accordingly, the Court would find that testimony of Mr. Dorsey, if given by any witnesses [sic], would fall within that exception to the hearsay rule." Tr.Vol. VI at 58
 
 
 [6]
 Q. Mr. Lukich, I believe I asked this yesterday: Did you ask Mr. Dorsey on the times you would--You were involved in basically every one of these instances. Correct?
 A. Right.
 Q. Yet the check would be made out to you, or he would have it endorsed by you?
 A. Yes.
 Q. And you would take Mr.--excuse me--Mr. Dorsey to the Western Union office?
 A. Right.
 Q. And again, did you--did you ever ask Mr. Dorsey, "Why don't you just send a check, or do this some other way?"
 A. Yes, of course, because Western Union office is on 9th and Euclid, and that's right downtown in Cleveland; and there is no parking. And he'd want me to take him down. And it was just such a confusion trying to leave him off and park the car. And I finally told him--I said, "This is crazy. What are you doing? Why don't you wire it? You can wire it or send him a check and--
 Q. When you say, "wire it," you mean from bank account to bank account?
 A. Yeah, to have the bank wire a check to Mr. St. Clair's account or send him a check. And he said Mr. St. Clair preferred the money being sent this way, so--
 Tr.Vol. VIII at 342.
 
 
 [7]
 The court offered to instruct the jury concerning the limited purpose of this testimony, which offer was declined by appellant
 
 
 [8]
 An idea of the magnitude of the financing held out can be gathered from some of the defendant's own testimony at the trial
 Q [on direct]. Let me ask you a question: Over the past three and a half days, you have heard a number of witnesses testify that you represented to them that once you got the Haitian American Bank opened for business that at that point, many millions--I think "billions" were thrown around--of dollars [sic] were going to come into the Haitian American Bank. I think what you need to do at this point is to explain to the jury how you expected that to happen.
 A. Well, on the first place, once it was issued, then once the certificate was issued, then we were to put up these deposit slips for the money, the notes for the money. And we were borrowing only one million--one billion [sic] dollars increments. We never were going to borrow any $10 billion at any one time. You can't even get rid of a billion dollars that easy. You've got to have places to put it so it will be bringing back money.
 ....
 Q. Where is it this $1 billion is coming from?
 A. From the trusts.
 Q. You better explain to us about these trusts. What do they consist of?
 A. There are several trusts throughout the world. They have those big trustees, and they do loan money, but not loan it to anybody; to a bank. No individual can go into a trust and borrow money. Only a bank.
 Q. Were you under the impression that they would loan this big money to you?
 A. Yes. It has to be a bank that they trust. They were going to trust me with a bank.
 ....
 Q. Okay. Now, who are these lenders?
 A. Well, now, at the time, I can't say.
 Q. Okay. When you say you can't say, you mean you don't want to say?
 A. No I don't want to say because these lenders--these are private lenders. And I mean they aren't pleased if you give their name all over the country.
 Tr.Vol. X at 701-03.